#24718-aff in pt & rev & rem in pt-DG

**2008 SD 109**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

STATE OF SOUTH DAKOTA,                                   Plaintiff and Appellee,

  v.

JAMES RAY HOFER and
KARLA KRISTINE HOFER
d/b/a Hofer's Used Cars, LLC,                            Defendants and Appellants.

\* \* \* \*
APPEAL FROM THE CIRCUIT COURT OF
THE FIRST JUDICIAL CIRCUIT
HUTCHINSON COUNTY, SOUTH DAKOTA

\* \* \* \*
HONORABLE GLEN W. ENG
Judge

\* \* \* \*

LAWRENCE E. LONG
Attorney General

JOHN M. STROHMAN
Assistant Attorney General
Pierre, South Dakota                    Attorneys for plaintiff
                                        and appellee.

KENNETH D. BERTSCH
Bertsch Law Office
Menno, South Dakota                     Attorney for defendants
                                        and appellants.

\* \* \* \*

CONSIDERED ON BRIEFS
ON MAY 19, 2008

OPINION FILED **11/12/08**

#24718

GILBERTSON, Chief Justice

[¶1.]        On April 9, 2007, James Ray Hofer and Karla Kristine Hofer (hereinafter individually, "Jim" and "Karla," or collectively, the "Hofers") were indicted by a Hutchinson County Grand Jury on 10 counts of grand theft by deception in violation of SDCL 22-30A-1,[1] SDCL 22-30A-3(4)[2] and SDCL 22-30A-17.[3] Under the terms of plea agreements, on August 13, 2007, the Hofers entered guilty pleas to Count 1 of the indictment while the remaining counts were dismissed.

[¶2.]        The circuit court entered a judgment of conviction and suspended execution of a ten-year prison sentence on Jim and a suspended imposition of sentence on Karla. The court entered these sentences on condition that, among other requirements, the Hofers pay restitution and each serve forty-eight days in

---

1.     SDCL 22-30A-1 provides that "[a]ny person who takes, or exercises unauthorized control over, property of another, with intent to deprive that person of the property, is guilty of theft."

2.     SDCL 22-30A-3 provides in pertinent part:
>Any person who obtains property of another by deception is guilty of theft. A person deceives if, with intent to defraud, that person: . . .
>>(4) Fails to disclose a known lien, adverse claim, or other legal impediment to the enjoyment of property which the deceiver transfers or encumbers in consideration for property the deceiver obtains, whether such impediment is or is not valid, or is or is not a matter of official record.
>The term, deceive, does not, however, include falsity as to matters having no pecuniary significance or puffing by statements unlikely to deceive reasonable persons.

3.     SDCL 22-30A-17 provides: Theft is grand theft, if the property stolen:
(1) Exceeds one thousand dollars in value; . . . Grand theft is a Class 4 felony.

the Hutchinson County Jail. The Hofers appeal the imposition of restitution and confinement orders. We affirm in part and reverse and remand in part.

## FACTS AND PROCEDURE

[¶3.] The Hofers operated a used car dealership in Mitchell, South Dakota.[4] The business was financed through a longstanding arrangement with the Farmers State Bank of Parkston, South Dakota (the "Bank"). Originally, the Hofers secured a lump-sum inventory loan from the Bank, upon which monthly payments were made from cash generated from used car sales. Initially, the Bank did not have a security agreement with the Hofers for each specific vehicle in their inventory, but rather, the Bank filed a blanket UCC-1, on all of the inventory, fixtures, and other assets of the car dealership, including the vehicle inventory and proceeds thereof.

[¶4.] The Hofers' used car inventory sustained substantial damage during a hail storm in 2003. Thereafter, they secured another lump-sum inventory loan from the Bank. In or around March 2005, the Bank decided that it needed to track the Hofers' used car inventory on a more individualized basis. Although it did not file a lien, the Bank required the Hofers to enter into separate security agreements for each vehicle in inventory.

[¶5.] Unbeknownst to the Bank, the Hofers began arranging financing through Dealer Services Corporation (DSC) and Automotive Finance Corporation (AFC), two Indiana based corporations specializing in dealer inventory finance.

---

4. Hofers operated their used car business through a limited liability company known as Hofers' Used Cars.

Using DSC and AFC financing, the Hofers "floorplanned"[5] their inventory and pledged individual vehicles as collateral for the loans. DSC and AFC perfected a purchase-money security interest in the individual vehicles, and the corresponding titles then identified DSC or AFC as the lien holder. Before the titles could be so marked, Hofers made copies of the original, clear, title to provide to the Bank along with their monthly inventory list, from which, the Bank then required Hofers to sign individual security agreements for the newly acquired inventory items. This scheme is known in the trade as a "double floor plan" (DFP).

[¶6.]     At a September 24, 2007 sentencing and restitution hearing, following the circuit court's acceptance of the Hofers' guilty pleas to Count 1 of the indictment, a letter to the Bank from DSC dated September 12, 2005 was received as an exhibit. It was from this letter that testifying Bank officials indicated they learned that DSC "[had] or expect[ed] to acquire a purchase-money security interest" in the Hofers' "Inventory" and "the identifiable proceeds" thereof. The letter stated as follows:

> All Debtor's [Hofers'] assets and properties wherever located, including without limitation all equipment of any kind or nature, all vehicles, vehicle parts and inventory now owned or hereafter acquired, without limitation, purchase money inventory, the purchase of which was financed or floorplanned by [DSC] for Debtor of whatever kind or nature, and all returns, repossessions, exchanges, substitutions, attachments, additions, accessions, accessories, replacements, and proceeds thereof; all accounts

---

5.     Floorplanning is the dealer industry term used to describe the arrangement whereby a dealer establishes a financing relationship to fund the purchase of inventory on a per-vehicle basis. When a vehicle is sold, the dealer pays the lender the financing balance, thereby releasing the lender lien on the vehicle so that clear title can be passed to the buyer.

> receivable, chattel paper, and general intangibles now
> owned or hereafter acquired by Debtor together with the
> proceeds thereof; all of Debtor's documents, books and
> records relating to the forgoing [sic].

[¶7.]     Upon receiving this letter, a loan officer with the Bank, Paul Bormann, telephoned Jim. Jim told Bormann that DSC was financing government auction vehicles or repossessions for them, that the Bank did not need to worry, and that Hofers probably would not use DSC anyway because "it was just a formality." Thereafter, the Bank decided to conduct an inspection of the inventory. The inspection took place at the Hofers' used car lot on November 1, 2005. A DSC representative was also present for the inspection. At that time, Bank officials discovered that the inventory listings that the Hofers had been providing, which the Bank used to determine how much collateral was securing the loans, included vehicles pledged to DSC. Bank officials also discovered that 25 vehicles that the Hofers had previously provided on inventory lists were not on the lot.

[¶8.]     Following the discovery of the irregularities in the Hofers' business practices, Jim was indicted on a federal charge of wire fraud for illicitly obtaining money for the purchase of vehicles by wire transfer. The Hofers went out of business and filed for Chapter 7 bankruptcy relief. On December 12, 2006, Jim pleaded guilty to the federal charge in the United States District Court, District of South Dakota. As part of his sentence, Jim was required to pay restitution to DSC in the amount of $40,468.83 and to the Bank in the amount of $108,470.00.

[¶9.]     Preliminary to the 2007 State proceedings against the Hofers, the South Dakota Department of Revenue and Regulation (the "DRR") conducted an investigation to determine the amount of restitution that the State would seek on

the Bank's behalf. The DRR's review was based on the individual vehicle security agreements that the Hofers had entered into with the Bank. The inventory lists that the Hofers provided to the Bank included the purchase price or value of the respective vehicles at the time the Hofers acquired them. From this information, the DRR determined that the Bank had suffered a loss of $294,163.36. At the conclusion of the September 24, 2007 hearing, the circuit court ordered the Hofers to pay restitution to the Bank in that amount as a condition of Jim's probation and suspended ten-year prison sentence and Karla's suspended imposition of sentence.

[¶10.]     As a further condition of these sentences, Jim and Karla were each ordered to serve two days per month in the Hutchinson County Jail, for twenty-four months. Following an October 22, 2007 hearing on the confinement condition of their respective sentences, Hofers were ordered to serve forty-eight consecutive days in jail, to begin within 120 days of the amended sentencing orders dated the October 26, 2007.

[¶11.]     The Hofers raise two issues on appeal:

1.     Whether the circuit court abused its discretion by awarding restitution in the amount of $294,163.36.

2.     Whether the circuit court abused its discretion by amending the sentencing order to reflect a modification of the confinement condition of the Hofers' respective sentences from two days per month for twenty-four months, to forty-eight consecutive days in jail.

## STANDARD OF REVIEW

[¶12.]     "[A circuit] court has broad discretion in imposing restitution." State v. Martin, 2006 SD 104, ¶5, 724 NW2d 872, 874 (citing State v. Thayer, 2006 SD 40, ¶16, 713 NW2d 608, 613). "However, questions of law are reviewed under a de novo

standard with no deference given to the trial court's conclusions." *Id*. (citing City of Deadwood v. Summit, Inc., 2000 SD 29, ¶9, 607 NW2d 22, 25 (citations omitted)). In regard to sentences involving incarceration, "[w]e give 'great deference to sentencing decisions made by the [circuit] courts.'" State v. Garber, 2004 SD 2, ¶13, 674 NW2d 320, 323 (quoting State v. Milk*, 2000 SD 28, ¶10, 607 NW2d 14, 17 (citing State v. Gehrke*, 491 NW2d 421, 422 (SD 1992) (citation omitted))). Therefore, "we generally uphold sentences within the statutory maximum." *Id*. (citing State v. Stahl*, 2000 SD 154, ¶5, 619 NW2d 870, 871-72 (citation omitted)).

## ANALYSIS AND DECISION

[¶13.]     **1.     Whether the circuit court abused its discretion by awarding restitution in the amount of $294,163.36.**

[¶14.]     The plea agreements signed by Jim and Karla each included an attached spreadsheet compiled by the DRR (the "Spreadsheet") that set out, on a per-vehicle basis, the pecuniary loss incurred by the Bank. The DRR compiled the Spreadsheet from floorplan values for each vehicle as provided by the Bank. The floorplan values were derived from the monthly inventory lists that were provided to the Bank by the Hofers and were the basis upon which the individual vehicle security agreements were drafted. *See supra* ¶5.

[¶15.]     Several categories of vehicles were listed on the Spreadsheet. The Spreadsheet included seven vehicles that were subjects of the district court's restitution order. For the State proceedings, the DRR imputed no loss for the Bank attributable to these vehicles.

[¶16.]     Six vehicles on the Spreadsheet were recovered by the Bank when the Hofers discontinued their business. The Bank sold these vehicles at auction for

substantially less than the value at which they were floorplanned. The DRR imputed the difference between the floorplan value and the auction sale proceeds as the Bank's loss attributable to these vehicles.

[¶17.] Ten vehicles on the Spreadsheet were specifically identified in Counts 1 through 10 of the indictment as DFP vehicles.[6] The remaining eighteen vehicles were not listed in the indictment, but the Hofers handled them in a manner similar to how they handled the vehicles in Counts 1 through 10.

[¶18.] The DRR calculated that for purposes of the State proceedings, the total loss incurred by the Bank attributable to the vehicles on the Spreadsheet was $294,163.36. One vehicle was listed under Count 1 of the indictment – a 2001 Oldsmobile Intrigue. For this vehicle, the DRR attributed loss to the Bank of $8,310.00. The Hofers argue that they pleaded guilty to Count 1 without conceding an admission of guilt for any other vehicle identified in the indictment, and accordingly, that the circuit court should only have imposed restitution for the amount attributable to the vehicle listed in Count 1 – the 2001 Oldsmobile Intrigue. Moreover, Hofers argue that since the Bank received the auction sale proceeds from the six vehicles it recovered after the Hofers discontinued their business, they should not have received any restitution with respect to those vehicles because the results of the auction sale evinced a fair market value.

> It is the policy of this state that restitution shall be made by each violator of the criminal laws to the victims of the violator's *criminal activities* to the extent that the violator is reasonably able to do so. An order of restitution may

---

6. One of these vehicles was also a subject of the district court's restitution order and consequently the DRR imputed no loss for this vehicle.

> be enforced by the state or a victim named in the order
> to receive the restitution in the same manner as a judgment
> in a civil action.

SDCL 23A-28-1 (emphasis added).

> *"Criminal activities,"* includes any crime for which there
> is a plea of guilty or verdict of guilty upon which a judgment
> of conviction may be rendered and *any other crime committed
> . . . which is admitted by the defendant, whether or not
> prosecuted. . . .*

SDCL 23A-28-2(2) (emphasis added).

[¶19.]     At the September 24, 2007 sentencing and restitution hearing, Karla

was called to testify to the circumstances surrounding the sale and disposition of

sale proceeds for the eighteen vehicles that were identified in the Spreadsheet, but

not specifically listed in the indictment.  In light of the plea agreements, wherein

the State agreed to dismiss Counts 2 through 10 of the indictment, defense counsel

expressed concern about the potential for additional criminal charges arising from

her testimony as to these vehicles that were not specifically listed in the indictment.

> [I]f Hofer's [sic] are to take the stand to testify as to vehicles
> that aren't included in [C]ounts I through X they may be
> exposing themselves to, *they may incriminate themselves
> on additional charges.*  [U]nless the State is willing to give
> them the agreement that they will not prosecute them
> on any of these vehicles that are listed on the [S]preadsheet
> *I'm going to have to consult with them and find out if they're
> wiling to waive their right to self incrimination on those
> other vehicles.*

(Emphasis added.)  In response to the State's reply that the vehicles were included

in the indictment, defense counsel clarified for the circuit court:

> [I]f the State is saying they're including all the vehicles
> in the [Counts] IX and X then I'm not worried about them
> coming back and bringing more charges.  [T]hey would
> be concerned that if all these vehicles aren't specifically

> *mentioned in a count that the State's going to turn around and prosecute them on a different vehicle.* So, I'm willing to stipulate that all the vehicles are included in [Counts] IX and X and they are all included in the Plea Bargain.

(Emphasis added.)

[¶20.]     After the foregoing clarification was acknowledged by the circuit court, Karla proceeded to offer fifty-seven pages of testimony as to the sale and disposition of proceeds from the sale of the eighteen vehicles. At some point during the latter half of 2005, Karla testified that she and Jim started consulting with a bankruptcy attorney. She stated that thereafter, they opened a new account with the Fulton State Bank (Fulton) and that some of the sale proceeds from the eighteen vehicles were deposited in this new account. The Hofers then issued checks on this account to AFC to pay loans and release liens on the vehicles. When asked why the account at Fulton had been opened Karla responded:

> That was done at the advisement of our bankruptcy attorney. [*H*]*e said if we put money in Farmers State Bank that, you know, by rights they could take the money. And we needed the money to pay off the titles, to get the people their titles **so there were no other victims**, you know, by the closing of our business.*

(Emphasis added.)

[¶21.]     In addition to buyer payments for these vehicles, Hofers also took vehicles in trade. The Hofers generally sold the trade-in vehicles at the Sioux Falls Auto Auction (the "Auto Auction"). While the Auto Auction usually issued checks to the Hofers for the sale proceeds, on other occasions the Auto Auction issued payment directly to lien holder, AFC. When Karla was asked why this was done, the following exchange occurred:

| Karla: | AFC had asked the [Auto A]uction not to give us the money because they knew that, you know, we were closing. |
|---|---|
| Defense Counsel: | They were aware of your situation with the [Bank]. |
| Karla: | Yes. |

[¶22.]     Karla also tried to explain that by issuing checks on their account at the Bank payable to AFC or DSC, they were fully disclosing the DFP to the Bank. However, on rebuttal, the Bank's vice president, James Bormann, indicated that this could not possibly serve as notice to the Bank.  He testified that several thousand depositor checks cleared the Bank each day and that it was not the Bank's policy to inspect each check for the identity of the payor and payee.

[¶23.]     On cross-examination, the State questioned Karla about the DFP. During one such inquiry the following exchange occurred:

| State: | Why don't you tell the [c]ourt why you and your husband double floor planned [sic] all those vehicles? |
|---|---|
| Karla: | *I never meant to deceive anyone.* |
| State: | Excuse me? |
| Karla: | *I never meant to deceive anyone.* |
| State: | All right.  So you got the money from DSC for a vehicle. Right? |
| Karla: | (*Nods head in an affirmative manner.*) |
| State: | *Then what did you do after that with respect to Farmers State Bank.* |
| Karla: | *Nothing.* |

(Emphasis added.)  In a more pointed inquiry into the DFP process the following exchange occurred on cross-examination:

| Karla: | What we did is bought a unit, it came in, the secretary did an inventory sheet.  That inventory sheet was FAXed every week on every vehicle that we had, whether what is a trade-in, financed or not financed, even consignment would show up on there, and that was sent off to the [B]ank at the request, usually every two weeks is when Paul Bormann would ask for it. |
|---|---|
| State: | [I]f I dig through my file here and if I look for a vehicle |

that was double floor planned [sic] I won't find one --

Karla: No.

State: -- that the [B]ank signed?

Karla: *No. You won't. That's why we're here.*

State: *So you defrauded the [B]ank, didn't you?*

Karla: *Not intentionally.*

(Emphasis added.) In reference to the Hofers depositing vehicle-sale proceeds at Fulton, the State addressed at least one occasion in which the sale proceeds went into an account for the Hofers' personal use. In this regard the following exchange occurred:

State: . . . Here you go to this Fulton Bank on October 19 of '05, . . . you sold it and you said you deposited the money in Fulton Bank?

Karla: It's a copy of the deposit slip.

State: And that was deposited into Hofer's Racing account?

Karla: Yah [sic]. It was Jim's racing account.

State: . . . *What is this racing account?*

Karla: *Hobby.*

. . .

State: All right. So this is --

Karla: This is his racing account.

State: -- his racing account.

Karla: *This is his personal account.*

State: So you deposited, *you took the money that belonged to the bank and, excuse me, the collateral that belonged to the bank and you sold it and you took the money and you deposited into Fulton Bank for a customer lien payoff, but you deposit it into your personal account. Correct?*

Karla: *Correct.*

(Emphasis added.)

[¶24.]    Following the conclusion of witness testimony, defense counsel acknowledged to the circuit court that through Karla's testimony, the Hofers "*clearly incriminated themselves.*" (Emphasis added.) Karla then offered her own statement to the court confessing that she was "*truly ashamed*" and that she "*never*

*intentionally meant to deceive Farmers State Bank*" and that she wanted to "*pay back yet move on.*" (Emphasis added.) She then went on to say, "*I am full of remorse and I regret my actions that caused the [B]ank to lose the money.*" (Emphasis added.)

[¶25.]     Jim also offered a statement to the circuit court:

> I just had some bad business practices and it got the best of me. . . . I really apologize for what I did. I didn't mean for it to get strung out this far. I just, you know, I thought I could pull my way out of it and it didn't work that way.

[¶26.]     We conclude that the transcript of the Hofers' statements at the September 24, 2007 hearing, including the foregoing testimony and remarks to the circuit court, evince an admission of criminal activity in regard to all vehicles covered under the indictment whether or not specifically listed. Accordingly, pursuant to SDCL 23A-28-1 and SDCL 23A-28-2(2), despite the fact the State elected not to prosecute the Hofers except as to all but one of these vehicles, the circuit court correctly imposed restitution attributable to all the vehicles specifically listed or stipulated to be included in the indictment.

[¶27.]     However, the State has not proven a causal connection between Hofers' title falsifications and the full restitution award of $294,136.36 (the total market value of *all* vehicles that were unavailable for repossession by the Bank when the business collapsed). This case does not involve a discretionary award of restitution. The question is purely a legal one: whether the State's proof was sufficient to satisfy the requirements for restitution. Although "a trial court has broad discretion in imposing restitution, . . . questions of law are reviewed under a de novo

standard with no deference given to the trial court's conclusions." *Martin*, 2006 SD 104, ¶5, 724 NW2d at 874 (citations omitted).

[¶28.]     Under the applicable statutes and cases, "restitution" is defined as "full or partial payment of pecuniary damages to a victim." SDCL 23A-28-2(4). "Victim" is defined as "any person . . . who has suffered pecuniary damages *as a result of* the defendant's criminal activities[.]" SDCL 23A-28-2(5) (emphasis added); State v. Willson, 2005 SD 90, ¶10, 702 NW2d 828, 830-31. The emphasized "as a result of" language requires a "causal connection between a defendant's crime and a victim's damages." *Id.* ¶10, 702 NW2d at 831; State v. Joyce, 2004 SD 73, ¶16, 681 NW2d 468, 471; State v. Davis, 458 NW2d 812 (SD 1990); State v. Munk, 453 NW2d 124 (SD 1990). Therefore, restitution was unavailable for the amount of the Bank's loss that was unrelated to Hofers' fraud; i.e., the amount the Bank would have otherwise lost on the unsecured portion of this loan.

[¶29.]     As is discussed below, although the Bank was entitled to some restitution, the uncontradicted evidence established that the requisite causal connection was absent for at least four types of vehicles. First, the proceeds from at least four of the vehicles were actually used to pay the Bank's loan. Therefore, the Bank was not entitled to recover those proceeds a second time. Second, proceeds from other vehicles were properly used to satisfy liens on vehicles that Hofers took in trade. Third, additional vehicles were financed by different lenders who held superior purchase money security interests. Finally, six vehicles were recovered by the Bank and sold at auction, which established the fair market value of those vehicles at that time. Therefore, even though Hofers falsified titles to substantiate

clear lien status of vehicles at their dealership, that fraud did not entitle the Bank to the proceeds of every vehicle that was unavailable for repossession. Although the Bank was entitled to restitution to the extent it suffered losses caused by the title falsifications, it was not entitled to restitution for the other losses caused solely by the fact that the Bank made a bad loan that was not fully secured.

[¶30.] The circuit court concluded that the Bank was entitled to restitution for the proceeds of four vehicles that the Bank already received, for all eight vehicles that were double floor planned and for all eighteen vehicles that were sold "out of trust."[7] The Bank was not entitled to recover the market value of all these vehicles because the testimony is undisputed that: (1) the Bank advanced no new money for the double floor planned vehicles; (2) Hofers acquired the double floor planned vehicles with money provided by other lenders who held superior purchase money security interests in those vehicles; (3) some proceeds realized from the eighteen vehicles sold "out of trust" were lawfully used to satisfy liens on vehicles taken in trade; and (4) some vehicle proceeds were used to pay the Bank's loan.[8]

[¶31.] In regard to the six vehicles recovered by the Bank and sold at auction following the discontinuation of the Hofers' business, we find that although the

---

7. The circuit court was correct in awarding restitution on the Dodge Ram pickup that the Hofers sold for $5,025 because this is the only sale in which Hofers admittedly used the proceeds for personal purposes unrelated to the payment of superior liens or the Bank's debt.

8. For example, vehicles on the Spreadsheet included a Dodge Quad Cab, a Ford F150, a Ford Style Slide, and an Oldsmobile Intrigue. Although the court ordered restitution for the full value of these vehicles, the uncontradicted evidence reflected that some or all the proceeds from those sales were used to make the monthly loan payments to the Bank.

Bank may not have been made whole by the proceeds obtained through the auction sale, since the collateral value associated with those vehicles was the value at which Hofers floorplanned them through the Bank, the sale proceeds obtained at auction reflected a fair market value for those vehicles at that time. The Bank's recourse against the Hofers for the balance of the collateral value is in civil court.

[¶32.]    The circuit court's award of restitution for the full purchase price (or the estimate of the market value) of all vehicles on the DRR's Spreadsheet was predicated on the theory that because the Bank's total loss on its partially unsecured loan exceeded the value of the vehicles, the Bank was entitled to the value of every vehicle that was unavailable. In the circuit court's view, there was a "nexus" between Hofers' criminal activities and the total value of all unavailable vehicles simply because: "Well, when there is a listing of inventory and those items have been sold and they're not used to repay the loan that you've been given, there's a direct nexus."[9]

[¶33.]    As previously noted, however, the circuit court's analysis fails to consider that other lenders advanced purchase-money to acquire some of that inventory, part of it was subject to superior liens of other creditors,[10] part of it was

9. In fairness to the circuit court, this was the only theory upon which restitution was sought. Neither the State nor the Bank quantified a loss that was caused by the title falsifications. Both simply sought the total unreimbursed balance of the Bank's unpaid loan.

10. The Bank's financing arrangement involved a long-standing operating loan secured by inventory but without perfection by title notation on individual vehicles. *See supra* ¶¶3-4. It is further undisputed that after the Bank's lump-sum operating loan, Hofers obtained additional financing through DSC and AFC. That financing included purchase money security interests that

(continued . . .)

applied to the Bank's debt, and part of it was lawfully applied to satisfy the liens on vehicles taken in trade. With respect to these lawful transactions, there was no causal connection between Hofers' falsification of titles and the Bank's inability to recover the proceeds of those vehicles. Indeed, the Bank officials who testified at the hearing never asserted that they could have recovered the proceeds from all vehicles on the Spreadsheet if they had not been misled with respect to the collateral that was actually present.[11] Furthermore, bank officials neither testified that they would have called the loan earlier nor quantified which part of their loss was caused by the title falsifications. Thus, there was no evidentiary support that Hofers' deception regarding the substantiation of available collateral was the cause of the Bank's entire loss and its inability to realize the proceeds from all missing vehicles. In other words, the Spreadsheet's listing of market values of all unavailable vehicles did not, in and of itself, establish *the amount* of the pecuniary loss *caused by* Hofers' misrepresentations.

[¶34.] Because an insufficient causal connection or nexus was established between the circuit court's $294,136.36 award and Hofers' criminal activities, we reverse and remand for findings of fact and conclusions of law on each of the

---

(. . . continued)
DSC and AFC perfected by lien notations. *See supra* ¶5. Thus, the Bank officer on this loan conceded that DSC received the proceeds of the double floor planned vehicles because the Bank only held a blanket security interest and DSC held a purchase money security interest.

11. At the restitution hearing, the Bank conceded that Hofers' fraud only involved deception regarding "substantiation" of the collateral that was present at the car dealership.

#24718

vehicles for which the State sought recovery of the vehicles' market value consistent with the foregoing analysis.[12] *See supra* ¶18. *Martin*, 2006 SD 104, ¶13, 724 NW2d 872, at 878 (reversing and remanding for reconsideration and the entry of findings of fact and conclusions of law establishing pecuniary loss).

[¶35.] **2. Whether the circuit court abused its discretion by amending the sentencing order to reflect a modification of the confinement condition of the Hofers' respective sentences from two days per month for twenty-four months, to forty-eight consecutive days in jail.**

[¶36.] During the September 24, 2007 sentencing hearing the circuit court heard evidence that the Hofers had contracted methicillin-resistant Staphylococcus aureus, a/k/a MRSA.[13] As a condition of Jim's suspended ten-year prison term and Karla's suspended imposition of sentence, the circuit court sentenced them to serve two days per month, for twenty-four months, in the Hutchinson County Jail. The circuit court entered its sentencing orders and thereafter, due to Hofers having MRSA, neither the Hutchinson County jail nor any other county jail in South

---

12. The circuit court entered no findings as to the six vehicles recovered by the Bank. We have held that it is appropriate for the circuit court to enter such findings, *see State v. Tuttle*, 460 NW2d 157, 159 (SD 1990), and we have remanded cases to the circuit court for entry of findings in this regard when absent. *See Martin*, 2006 SD 106, ¶13, 724 NW2d at 878. However, in a case such as *Martin*, this is done so that we may have some manner upon which to review the circuit court's decision as to restitution when the defendant has damaged property and replacement is an issue. *Id*. ¶8. The instant case does not present an issue of damage or replacement as to the six vehicles recovered by the Bank, but rather one in which the Bank is attempting to recover monies extended in credit to the Hofers.

13. MRSA infection is a contagious, antibiotic resistant strain of the Staphylococcus aureus bacteria or "staph." http://www.mayoclinic. com/health/mrsa/DS00735/DSECTION=1 (last visited November 5, 2008).

Dakota was willing to house them under the terms of the confinement portion of their sentence.

[¶37.] Eventually, arrangements were made with the Pennington County Jail to accommodate the Hofers. However, Pennington County's agreement to do so was contingent upon the Hofers serving their jail terms on a forty-eight consecutive day schedule. On October 22, 2007, a second sentencing hearing was held before the circuit court, after which the court amended Jim's and Karla's sentencing orders to reflect forty-eight consecutive days of confinement. The court then entered an amended judgment of conviction as to Jim and amended suspended imposition of sentence as to Karla.

[¶38.] The Hofers allege that by modifying their forty-eight-day jail sentence from the "two days per month for 24 month" schedule, to consecutive days would not enable them to continue with their respective employments and that as a result Karla would loose here employer-provided health care plan which covers treatment and medications for their MRSA conditions. The Hofers cite SDCL 23A-31-1 and argue that this change to consecutive-days jail term, resulting in loss of employment and related benefits, constitutes an increase in severity of sentence that is not provided for under our law. *See* State v. Ford, 328 NW2d 263, 267 (SD 1982) (holding that "as against an unwilling defendant, a valid sentence cannot be increased in severity after he has commenced the serving thereof") (quoting State v. Hughes, 62 SD 579, 584, 255 NW 800, 802 (1934)) (citing State v. Jackson, 272 NW2d 102 (SD 1978); *Ex parte* Watt, 73 SD 436, 44 NW2d 119 (1950)).

[¶39.]        Contrary to the Hofers' claim that the change of the manner of serving forty-eight days in jail constituted an improper increase to their sentences, the change was actually a modification of a condition of probation recited in the sentences and is authorized under SDCL 23A-27-20.1, which provides as follows: "The court, upon notice to the probationer, a hearing and good cause, shown, may modify the terms and conditions of a probation which may include extending the probationary period."

[¶40.]        The circuit court suspended imposition of sentence for Karla and placed her on probation for ten years upon several conditions.  The document was entitled "ORDER SUSPENDING IMPOSITION OF SENTENCE FOR KARLA KRISTINE HOFER."  The order provided that "with the consent of the Defendant," the imposition of sentence was suspended, and Karla was placed on "supervised probation with the chief court services officer of this circuit or his representative for a period of ten (10) years upon the following conditions: . . ."  One of the conditions provided as follows:

> that defendant Karla Kristine Hofer shall spend two (2) days each month (the first weekend of each month) for two years in the Hutchinson County Jail, or at its duly authorized designee, from 7:00 p.m. on Friday until 7:00 p.m. on following Sunday, and the implementation of this jail sentence begins on October 5, 2007[.]

In a similar document entitled "JUDGEMENT OF CONVICTION AND ORDER SUSPENDING EXECUTION OF SENTENCE FOR JAMES RAY HOFER," the circuit court sentenced James to the South Dakota State Penitentiary for ten years. The court suspended the entire prison sentence and placed James on supervised

probation for ten years. One of the conditions was the same as Karla's and required James to serve two days jail time each month for two years.

[¶41.] The only change in the amended orders/sentences for Karla and James was the one probation condition concerning jail time. The condition was modified to require them to "spend forty-eight (48) consecutive days in the Hutchinson County Jail, or at its duly authorized designee, and said jail sentence must begin within 120 days from the date of this Judgment." The total number of days of jail time remained the same as the original condition. The only difference was that the forty-eight days had to be served consecutively rather than two days a month for two years.

[¶42.] The circuit court did not change the original sentences; it only changed one condition of probation. Technically, the circuit court was modifying the conditions of probation rather than the sentences. The defendants originally agreed to jail time as a condition of probation. When the court modified the probation condition by requiring the total time to be served consecutively, it did not enhance the total number of days required to be served. The modification was to provide an alternative method for the defendants to meet the condition of serving time in the county jail yet remain on probation and realize the benefit of the suspended imposition of sentence and suspended sentence. Therefore, we find no error in the circuit court's amended sentencing order.

[¶43.] Affirmed in part and reversed and remanded in part.

[¶44.] SABERS, KONENKAMP, ZINTER, and MEIERHENRY, Justices, concur.