#27385-a-DG

**2016 S.D. 18**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

STATE OF SOUTH DAKOTA,                Plaintiff and Appellee,

    v.

KEVIN JAMES RICE,                          Defendant and Appellant.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE BRADLEY G. ZELL
Judge

\* \* \* \*

MARTY J. JACKLEY
Attorney General

JARED TIDEMANN
Assistant Attorney General
Pierre, South Dakota                       Attorneys for plaintiff
                                             and appellee.


NICOLE J. LAUGHLIN
Sioux Falls, South Dakota                  Attorney for defendant
                                             and appellant.

\* \* \* \*

CONSIDERED ON BRIEFS
ON JANUARY 11, 2016

OPINION FILED **03/02/16**

#27385

GILBERTSON, Chief Justice

[¶1.]     Kevin James Rice appeals the circuit court's imposition of an 80-year sentence for one count of first-degree manslaughter. Rice asserts his sentence violates the Eighth Amendment's prohibition against cruel and unusual punishment. We affirm.

**Facts and Procedural History**

[¶2.]     On December 2, 2013, Sioux Falls resident Jason LaBeau returned home after work to discover two intruders in his home attacking his 20-year-old son, Jordan. After Jason rushed to Jordan's aid, one of the intruders produced a pistol and shot both Jason and Jordan. After the shooting, the intruders fled the scene, leaving behind the pistol and one of their cell phones. Jason summoned help, but Jordan died before emergency assistance arrived. Jason survived his injuries.

[¶3.]     Law enforcement's investigation revealed a plot conceived by Jordan's girlfriend, Faith Rasmussen, and orchestrated by Rice to steal $100,000 in cash from Jordan. Rasmussen ran a drug-distribution operation in Sioux Falls. She and Rice became acquainted with one another in the course of Rice's work for her as a distributor. In the fall of 2013, Rasmussen told Rice that Jordan kept $100,000 in a shoebox under his bed.[1] She showed Rice a picture as proof and gave him Jason's work schedule. Rasmussen's ex-boyfriend, Austin Hogan, drove Rice to, and identified, Jordan's home.

---

1.     This money was purportedly Jordan's share of proceeds from marijuana distribution.

-1-

[¶4.] Rice began recruiting help. He first contacted his long-time friend, Doug Scholten. Rice then contacted Brian Anderson, an 18-year-old senior from Watertown High School who had been selling marijuana for Rice. Rice told Anderson that Jordan had previously been robbed without putting up a fight, that Jordan would likely be under the influence when they entered the house, and that Jason would not be home until after 5:00 p.m. Anderson agreed to the plan and in turn, recruited his friend, Trevor Kruthoff, a 17-year-old high school student from Watertown.

[¶5.] Shortly before December 2, Anderson and Kruthoff drove to Sioux Falls from Watertown. After meeting Rice, the three of them drove to the LaBeau residence. The three agreed that Anderson and Kruthoff would carry out the plan. The two would-be intruders plotted their point of entry and then returned to Watertown. On December 2, Anderson and Kruthoff called Rice to tell him they intended to carry out the plan that day. The two skipped school; packed duct tape, gloves, and handcuffs; left Watertown; and joined Rice and Scholten at Rice's residence. While there, Rice handed a pistol to Scholten, who loaded the weapon with ammunition. Rice then handed the weapon to Anderson.

[¶6.] Armed with a loaded firearm and a hammer, the four left Rice's residence in two different vehicles. Rice and Scholten drove one car; Anderson and Kruthoff, the other. Upon arriving at Jordan's house, the four noticed that his vehicle was there. Although Rice noted that the presence of Jordan's vehicle indicated Jordan was likely home, Anderson and Kruthoff decided to proceed as

planned. Rice and Scholten drove to a nearby convenience store and waited for Anderson and Kruthoff to return.

[¶7.] Anderson and Kruthoff entered the home through a basement window and were almost immediately confronted by Jordan. Anderson and Kruthoff attempted to restrain Jordan. Despite the information Rice had received from Rasmussen, Jason returned home from work at 2:15 p.m. Jason struck Anderson, and Kruthoff drew the pistol. Anderson commanded Kruthoff to fire the weapon, and Kruthoff complied, firing multiple shots at—and striking—Jason. Kruthoff then turned the weapon on Jordan, shooting him as well.

[¶8.] Anderson and Kruthoff fled the scene, leaving behind the pistol and Kruthoff's cell phone. The pair did not locate the $100,000.[2] Rice and Scholten saw Anderson and Kruthoff's vehicle speed past the convenience store. Anderson sent a text message to Rice indicating there was a problem, and the four met back at Rice's residence. Rice and Scholten provided clean clothing to Anderson and Kruthoff. Rice and Scholten then destroyed Anderson's phone, disposed of as much evidence as they could, and fled to Madison for the night. Anderson and Kruthoff returned to Watertown.

[¶9.] Rice, Scholten, Anderson, and Kruthoff were all arrested and charged with homicide. All four subsequently pleaded guilty to first-degree manslaughter. Anderson and Kruthoff also pleaded guilty to aggravated assault. Rice was sentenced to 80 years imprisonment with 20 years suspended. Scholten was sentenced to 30 years imprisonment with all 30 years suspended. Anderson was

---

2. The police later found $89,000 in cash in the LaBeau residence.

sentenced to 80 years imprisonment with 30 years suspended for manslaughter. He also received a suspended, concurrent, 15-year sentence for aggravated assault. Kruthoff was sentenced to 80 years imprisonment with 40 years suspended for manslaughter. He also received a suspended, concurrent, 15-year sentence for aggravated assault.

[¶10.] Rice raises one issue on appeal: Whether his sentence violates the Eighth Amendment's prohibition against cruel and unusual punishment.

## Standard of Review

[¶11.] "We generally review a circuit court's decision regarding sentencing for abuse of discretion." *State v. Chipps*, 2016 S.D. 8, ¶ 31, ___ N.W.2d ___, ___ (quoting *State v. Garreau*, 2015 S.D. 36, ¶ 7, 864 N.W.2d 771, 774). "However, when the question presented is whether a challenged sentence is cruel and unusual in violation of the Eighth Amendment, we conduct a de novo review . . . to determine whether the sentence[] imposed . . . [is] grossly disproportionate to [the] offense[]." *Id.*

## Analysis and Decision

[¶12.] Rice asserts that a sentence of 80 years is grossly disproportionate to the circumstances of the crime to which he pleaded guilty. Specifically, Rice argues that the sentence he received is cruel and unusual because it is disproportionate to the sentence Scholten received. Rice also argues that the sentencing court did not properly weigh his background, criminal history, age, or prospects for rehabilitation in determining his sentence. Rice presents all of these arguments as supporting the conclusion that his sentence violates the Eighth Amendment. In doing so, Rice

conflates the questions whether his sentence is constitutional and whether it is an abuse of discretion. These questions are not synonymous, and the analysis for each is different.

[¶13.] We recently surveyed United States Supreme Court decisions on the Eighth Amendment and explained the proper analysis of cruel-and-unusual-punishment cases in *Chipps*. The question whether a noncapital sentence violates the Eighth Amendment requires us to determine de novo whether the sentence imposed is grossly disproportionate to its corresponding offense. *Harmelin v. Michigan*, 501 U.S. 957, 1001, 111 S. Ct. 2680, 2705, 115 L. Ed. 2d 836 (1991) (Kennedy, J., concurring in part and concurring in the judgment); *Chipps*, 2016 S.D. 8, ¶ 38, ___ N.W.2d at ___. To do so, we first compare the gravity of the offense—i.e., "the offense's relative position on the spectrum of all criminality"—to the harshness of the penalty—i.e., "the penalty's relative position on the spectrum of all permitted punishments." *Chipps*, 2016 S.D. 8, ¶¶ 35-38, ___ N.W.2d at ___. "If the penalty imposed appears to be grossly disproportionate to the gravity of the offense, then we will compare the sentence to those 'imposed on other criminals in the same jurisdiction' as well as those 'imposed for commission of the same crime in other jurisdictions.'" *Id.* ¶ 38, ___ N.W.2d at ___ (quoting *Solem v. Helm*, 463 U.S. 277, 291, 103 S. Ct. 3001, 3010, 77 L. Ed. 2d 637 (1983)). The challenged sentence is cruel and unusual only if these comparisons "validate [the] initial judgment that [the] sentence is grossly disproportionate to [the] crime." *Id.* ¶ 34, ___ N.W.2d at ___ (quoting *Harmelin*, 501 U.S. at 1005, 111 S. Ct. at 2707).

[¶14.]     We begin by examining the gravity of Rice's offense. Rice pleaded guilty to first-degree manslaughter. Among other instances, this offense occurs when one human being kills another "[w]ithout any design to effect death . . . but by means of a dangerous weapon[.]" SDCL 22-16-1, -15(3). Historically, homicide has long been considered "the highest crime against the law of nature, that man is capable of committing." 4 William Blackstone, *Commentaries* \*177-78. Although the gravity of the offense of manslaughter is less than that of murder, first-degree manslaughter is still an unjustified and unexcused killing. This crime is among those deemed inherently violent by the South Dakota Legislature, SDCL 22-1-2(9), which contributes to the gravity of this offense, *Chipps*, 2016 S.D. 8, ¶ 35, ___ N.W.2d at ___ ("Nonviolent crimes are less serious than crimes marked by violence or the threat of violence." (quoting *Helm*, 463 U.S. at 292, 103 S. Ct. at 3011)). Therefore, as a lesser form of the highest crime, the gravity of first-degree manslaughter is relatively great on the spectrum of criminality.

[¶15.]     Next, we examine the harshness of Rice's sentence. The circuit court sentenced Rice to 80 years imprisonment with 20 years suspended. First-degree manslaughter is a Class C felony, which carries a maximum sentence of life imprisonment and a fine of $50,000. SDCL 22-6-1, -16-15. More severe punishments authorized by the Legislature include death (Class A felonies) and mandatory life imprisonment (Class A and Class B felonies). Notably, the fact that the court imposed a term of years instead of a life sentence means that Rice could be eligible for parole in the future. *See* SDCL 24-15-4 ("No inmate sentenced to life imprisonment is eligible for parole . . . ."). Because the gravity of first-degree

manslaughter is relatively great on the spectrum of criminality, Rice's sentence does not appear to be grossly disproportionate.

[¶16.] Despite the foregoing, Rice argues that his sentence is cruel and unusual because it is "grossly disproportionate with the sentences imposed on his co-defendants." Rice primarily relies on *State v. Bonner*, 1998 S.D. 30, 577 N.W.2d 575. In that case, we reviewed a defendant's challenge of consecutive, 15-year sentences for second-degree burglary and third-degree rape. In contrast to Bonner's 15-year sentence for burglary, his two codefendants received suspended sentences with probation. *Id.* ¶ 18, 577 N.W.2d at 580. We held that Bonner's burglary sentence was grossly disproportionate to his offense for a variety of reasons including: (1) the disparity between his 15-year sentence and the suspended sentences his codefendants received; (2) his lack of a serious criminal history; (3) the absence of violence and menace in the offense; and (4) the sentence was the maximum allowed by statute. *Id.* ¶¶ 23-25, 577 N.W.2d at 581-82. Taking this opportunity to revisit our decision in *Bonner*, we conclude that its Eighth Amendment analysis will no longer be followed by this Court.

[¶17.] In light of the Eighth Amendment analysis detailed in *Chipps* and summarized above, *see supra* ¶ 13, there are several analytical problems with *Bonner's* conclusion that the 15-year sentence at issue in that case was grossly disproportionate to the crime of second-degree burglary. First, *Bonner* considered the disparity between the defendant's and codefendants' sentences in answering the threshold question whether Bonner's sentence appeared to be grossly disproportionate to the gravity of his offense. As discussed above, the appearance of

gross disproportionality of sentence to offense is a precondition for comparing the sentence to those "imposed on other criminals in the same jurisdiction[.]" *Chipps*, 2016 S.D. 8, ¶ 38, ___ N.W.2d at ___ (quoting *Helm*, 463 U.S. at 291, 103 S. Ct. at 3010). As such, a defendant's sentence must appear grossly disproportionate to his offense *before* it will be compared to a sentence imposed on a codefendant. Therefore, the disparity between Bonner's sentence and his codefendants' sentences should not have been used to answer the threshold question of gross disproportionality.

[¶18.] Second, citing Justice Kennedy's discussion of *Helm*, *Bonner* states that a defendant's lack of prior felony convictions "certainly bears on the question of gross disproportionality." *Bonner*, 1998 S.D. 30, ¶ 23, 577 N.W.2d at 582 (citing *Harmelin*, 501 U.S. at 1002, 111 S. Ct. at 2705). However, the portion of Justice Kennedy's opinion cited in *Bonner* specifically referred to the felonies underlying the defendant's *recidivism conviction* instead of simply his entire criminal history (or lack thereof). *Harmelin*, 501 U.S. at 1002, 111 S. Ct. at 2705. For purposes of challenging the constitutionality of a sentence in a noncapital case, it appears that a defendant's criminal history is only relevant when the sentence is enhanced under recidivism statutes. *See Ewing v. California*, 538 U.S. 11, 29, 123 S. Ct. 1179, 1190, 155 L. Ed. 2d 108 (2003) (plurality opinion); *Harmelin*, 501 U.S. at 1002, 111 S. Ct. at 2705; *Helm*, 463 U.S. at 296, 103 S. Ct. at 3013. In such a case, "the latest crime . . . is considered to be an aggravated offense[,]" *Ewing*, 538 U.S. at 25-26, 123 S. Ct. at 1188 (quoting *Witte v. United States*, 515 U.S. 389, 400, 115 S. Ct. 2199, 2206, 132 L. Ed. 2d 351 (1995)), and the gravity of the past offenses is

incorporated into the gravity of the present (aggravated) offense, *id.* at 29, 123 S. Ct. at 1189-90. Therefore, these Supreme Court decisions do not support *Bonner's* conclusion that a defendant's lack of a criminal history mitigates the gravity of the offense under consideration.[3]

[¶19.] Third, *Bonner* found relevant the fact that the circuit court imposed the maximum sentence permitted by statute for second-degree burglary. However, the Eighth Amendment is not concerned with the harshness of a penalty relative to the range of punishments permitted for a particular offense. Rather, as we explained in *Chipps*, "[t]he harshness of the penalty . . . refers to the penalty's relative position on the spectrum of *all permitted punishments*." 2016 S.D. 8, ¶ 37, ___ N.W.2d at ___ (emphasis added) (citing *Harmelin*, 501 U.S. at 1001, 111 S. Ct. at 2705; *Helm*, 463 U.S. at 297, 103 S. Ct. at 3013 (Kennedy, J., concurring in part and concurring in the judgment)). Bonner's sentence should not have been compared to the maximum sentence permitted by statute for second-degree burglary. Instead, the harshness of Bonner's sentence should have been determined by examining the entire range of punishments "that the State could have imposed on any criminal for any crime." *Id.* (quoting *Helm*, 463 U.S. at 297, 103 S. Ct. at 3013). Thus, the fact that Bonner's sentence was the maximum permitted by

---

3. Further, as *Bonner* itself recognized, mitigating factors generally are not considered in noncapital cases. 1998 S.D. 30 ¶ 22, 577 N.W.2d at 581 (citing *Harmelin*, 501 U.S. at 995, 111 S. Ct. at 2702 (majority opinion)).

statute for his particular offense was not relevant to an Eighth Amendment analysis.[4]

[¶20.]     Finally, *Bonner* also states that our review under the Eighth Amendment must include "utmost deference to the Legislature and the sentencing court." 1998 S.D. 30, ¶ 17, 577 N.W.2d at 580. However, such deference plays only a passive role in reviewing the constitutionality of a sentence. As we noted in *Chipps*, "Justice Kennedy did not directly apply these principles in his Eighth Amendment analysis." 2016 S.D. 8, ¶ 33, ___ N.W.2d at ___. Instead, he relied on deference to the legislature in concluding that the Eighth Amendment merely forbids gross disproportionality—rather than requires strict proportionality— between sentence and offense. *Harmelin*, 501 U.S. at 1001, 111 S. Ct. at 2705; *Chipps*, 2016 S.D. 8, ¶ 33, ___ N.W.2d at ___. Thus, deference for the legislature already inheres in the gross-disproportionality standard and should not be considered as a separate factor.

[¶21.]     *Chipps* signaled a course correction in our Eighth Amendment decisions. *Bonner* is still an important decision because it abandoned the shock-the- conscience test previously employed by this Court for analyzing cruel-and-unusual-

---

4.     For the same reasons, the fact that a sentence is less than the statutory maximum does not necessarily support the conclusion that the sentence is constitutionally permissible. For example, a sentence of life imprisonment for driving with an expired license would likely be grossly disproportionate even if the Legislature had authorized the more severe penalty of death for that offense. Similarly, a sentence in excess of the statutory maximum is not necessarily unconstitutional. For example, the maximum sentence authorized for possession of more than two ounces but less than one-half pound of marijuana is two years imprisonment. While a sentence of two years and one day for such a crime would be an illegal sentence, it would likely not be grossly disproportionate.

punishment claims in favor of Justice Kennedy's gross-disproportionality analysis from *Harmelin*. *Bonner*, 1998 S.D. 30, ¶¶ 13, 16, 577 N.W.2d at 579-80. Furthermore, as discussed below, some of the legal concepts *Bonner* incorrectly attributed to an Eighth Amendment analysis are nevertheless relevant to the question whether a particular sentence is an abuse of discretion. Therefore, we depart from *Bonner* (and its progeny) to the extent that its Eighth Amendment analysis deviates from that explained in *Chipps*.

[¶22.] In light of the foregoing, it is clear that Scholten's sentence is not relevant to answering the threshold question whether Rice's sentence appears to be grossly disproportionate to the offense of first-degree manslaughter. Rice's remaining arguments are likewise not relevant to an Eighth Amendment analysis. Therefore, our conclusion that Rice's sentence is not grossly disproportionate to his offense is unchanged. However, in fairness to Rice, we address his remaining arguments as challenges to the sentencing court's discretion.

[¶23.] In contrast to the Eighth Amendment analysis, the question whether the sentencing court acted within its discretion requires a separate analysis. "Within constitutional *and* statutory limits, the trial courts of this state exercise broad discretion when deciding the extent and kind of punishment to be imposed." *State v. Grosh*, 387 N.W.2d 503, 508 (S.D. 1986) (emphasis added). Therefore, we review the sentencing court's decision for an abuse of discretion. *Chipps*, 2016 S.D. 8, ¶ 31, ___ N.W.2d at ___. "An abuse of discretion 'is a fundamental error of judgment, a choice outside the range of permissible choices . . . .'" *MacKaben v. MacKaben*, 2015 S.D. 86, ¶ 9, 871 N.W.2d 617, 622 (quoting *Gartner v. Temple*,

2014 S.D. 74, ¶ 7, 855 N.W.2d 846, 850). Consequently, "a sentence within the statutory maximum [generally] will not be disturbed on appeal." *State v. Bruce*, 2011 S.D. 14, ¶ 28, 796 N.W.2d 397, 406 (quoting *Bonner*, 1998 S.D. 30, ¶ 10, 577 N.W.2d at 578).

[¶24.] Rice first argues that his "sentence is grossly disproportionate with the sentences imposed on his co-defendants." Specifically, Rice argues that his involvement in the crime was comparable to Scholten, who received only a 30-year, suspended sentence, in that neither Rice nor Scholten participated in the actual home invasion. Generally, similarly situated defendants should receive similar sentences. *See Bonner*, 1998 S.D. 30, ¶ 12, 577 N.W.2d at 578. This principle naturally follows from the notion that "[w]hen . . . statutory ranges are established, the legislative intent is that 'the more serious commissions of the crime deserve sentences at the harsher end of the spectrum.'" *Bruce*, 2011 S.D. 14, ¶ 32, 796 N.W.2d at 407 (quoting *Bonner*, 1998 S.D. 30, ¶ 25, 577 N.W.2d at 582). Even so, the fact that Rice and Scholten pleaded guilty to the same offense does not mean they share the same level of culpability for that offense. *State v. Garber*, 2004 S.D. 2, ¶ 33, 674 N.W.2d 320, 328. In order to suggest the sentencing court abused its discretion, then, Rice must show that his and Scholten's "past records, demeanor, *degree of criminal involvement*, etc., are sufficiently similar as to cause the sentence disparity between them to be unjust." *Id.* ¶ 32, 674 N.W.2d at 328 (emphasis added) (quoting *Bonner*, 1998 S.D. 30, ¶ 20, 577 N.W.2d at 581).

[¶25.]      Rice and Scholten are not similarly situated defendants.  In this case, the sentencing court found Rice to be the most culpable of the defendants and Scholten the least culpable.  As the court noted:

> I do [believe] that at least on this date and the . . . incident that took place with Jordan, you were in the center of it and that you did promote, did not prevent, you were aware of it, you provided a weapon for it, you assisted in the . . . covering up of evidence by not disclosing the information and such, so you were a very key part in the center of this activity.
>
> . . . I believe your enrollment, engagement in this was more pivotal than others.

The sentencing court "had the opportunity to personally evaluate the relative character, demeanor, and truthfulness of each defendant.  In addition, [the court] was able to gauge the relative culpability of each defendant."  *Id.* ¶ 33, 674 N.W.2d at 328.  We see no reason to disagree with the court.  Rice was the architect of the criminal conspiracy that led to Jordan's death.  Rice assembled the other defendants.  He placed a loaded weapon in the hands of two high school students and directed them toward the LaBeau residence despite knowing they were likely to encounter Jordan inside the house.  Rice then attempted a coverup.  In short, this particular crime would not have occurred but for Rice's involvement.[5]  Therefore, the disparity in sentences imposed on Rice and Scholten does not suggest the sentencing court abused its discretion.

---

5.      We have previously held that the mastermind of a homicide can be more culpable than even a codefendant who actually delivers the killing blow.  *See State v. Piper*, 2006 S.D. 1, ¶ 90, 709 N.W.2d 783, 816 ("Piper planned and directed the plot from its inception.  He cites to no authority which holds less culpable the masterminds of a murder plot while more severely punishing those who assist in carrying it out."); *State v. Page*, 2006 S.D. 2, ¶ 111-12, 709 N.W.2d 739, 775 (holding defendant who instigated incident resulting in homicide more culpable than codefendant).

[¶26.] Rice also argues a number of other factors should have mitigated the sentence he received. Rice claims that he has a limited criminal history and is relatively young. He also claims to be a good candidate for rehabilitation. Rice correctly asserts that "the sentencing court should 'acquire a thorough acquaintance with the character and history of the man before it.'" *Bonner*, 1998 S.D. 30, ¶ 19, 577 N.W.2d at 580 (quoting *State v. Lemley*, 1996 S.D. 91, ¶ 12, 552 N.W.2d 409, 412). However, Rice does not actually claim that the sentencing court failed to consider these factors. Even if he did, the record indicates the opposite is true. In announcing the sentence, the court said:

> 60 years, I believe this is your first felony conviction, as I understand it, would make you eligible for parole in 30 years, make you 51 years old before you're eligible for parole.
>
> That is the length of time I believe is important for retribution in this matter. I believe that's important for rehabilitation. I hope it's significant enough for deterrence. I know it will deter you. I hope it will deter others.

This excerpt alone indicates the court considered Rice's criminal history, age, and prospects for rehabilitation in crafting a sentence. The court also explicitly noted, "Regarding rehabilitation, the sentence the [c]ourt is imposing recognizes that you are currently 21 years of age."[6]

[¶27.] Additionally, Rice ignores other factors relevant to crafting a sentence. "In fashioning an appropriate sentence, courts must also look to the character and history of the defendant. This requires an examination of a defendant's 'general

---

6. Rehabilitation "is not a bright-line rule [that] must be considered in every case[.]" *State v. Milk*, 2000 S.D. 28, ¶ 18, 607 N.W.2d 14, 20. As Justice Kennedy noted in his opinion in *Harmelin*, retribution, rehabilitation, and deterrence are each legitimate penological goals. 501 U.S. at 999, 111 S. Ct. at 2704.

moral character, mentality, habits, social environment, tendencies, age, aversion or inclination to commit crime, life, family, occupation, and previous criminal record' . . . ." *Bruce*, 2011 S.D. 14, ¶ 29, 796 N.W.2d at 406 (citation omitted) (quoting *Bonner*, 1998 S.D. 30, ¶ 19, 577 N.W.2d at 580). Although Rice's previous criminal *record* is not extensive, Rice has displayed an inclination to commit crime. The presentence investigation (PSI) indicates that Rice admitted involvement in an ongoing drug-distribution operation with Rasmussen, Hogan, and Jordan for at least a year prior to this homicide. During that time, Rice derived consistent income by selling marijuana in Sioux Falls, Vermillion, and Watertown. Rice also admitted to daily marijuana use and periodic opiate (Oxycodone) use. Although Rice claims that violence was never associated with this drug-distribution operation, it is that very operation that set the stage for the burglary and homicide that occurred on December 2, 2013. Additionally, the PSI concluded that Rice is a moderate risk to reoffend.

[¶28.]     Finally, the sentence itself reflects that the sentencing court had these factors in mind. The Legislature authorized the court to impose a life sentence on Rice for committing first-degree manslaughter. SDCL 22-6-1, -16-15. However, the court imposed a sentence of substantially less time.[7] By imposing a term of years, the court preserved the possibility of future parole for Rice, *see* SDCL 24-15-4, and struck a balance between retribution, rehabilitation, and deterrence. In light of the foregoing, we are unable to conclude that the sentencing court's decision was "a

---

7.     The court could have also imposed a fine of up to $50,000 on Rice but chose not to. SDCL 22-6-1, -16-15.

choice outside the range of permissible choices[.]" *MacKaben*, 2015 S.D. 86, ¶ 9, 871 N.W.2d at 622 (quoting *Gartner*, 2014 S.D. 74, ¶ 7, 855 N.W.2d at 850). Therefore, the court did not abuse its discretion.

## Conclusion

[¶29.] We recognize *Bonner's* incompatibility with the United States Supreme Court's Eighth Amendment analysis as explained in *Chipps*. Today, we further refine our review of excessive-sentence claims by properly distinguishing between the constitutional and discretional dimensions of sentencing. Hereafter, this Court will adhere to this refinement in analyzing these types of issues.[8] Accordingly, the harshness of the sentence Rice received is not grossly disproportionate to the gravity of his offense. Although Rice's sentence is more severe than that imposed on Scholten, Rice's culpability is correspondingly greater. Therefore, the circuit court neither violated the Eighth Amendment nor abused its discretion in sentencing Rice. We affirm.

[¶30.] ZINTER, SEVERSON, WILBUR, and KERN, Justices, concur.

---

8. We emphasize that our decision today does not foreclose the types of arguments analyzed in *Bonner*. Rather, our decision functionally changes the standard by which we review some of those arguments. Arguments that bear on the constitutional question whether a sentence is grossly disproportionate to an offense present questions of law that we review de novo. In contrast, arguments that bear on the question whether the sentencing court acted within its discretion will be reviewed under the abuse-of-discretion standard.