#28630-a-JMK
**2019 S.D. 45**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

    v.

KENNETH CRAIG HAUGE,                      Defendant and Appellant.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE FIRST JUDICIAL CIRCUIT
HANSON COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE CHRIS GILES
Judge

\* \* \* \*

JASON R. RAVNSBORG
Attorney General

QUINCY R. KJERSTAD
Assistant Attorney General
Pierre, South Dakota                      Attorneys for plaintiff
                                             and appellee.

WANDA HOWEY-FOX of
Harmelink & Fox Law Office, PLLC
Yankton, South Dakota                     Attorneys for defendant
                                             and appellant.

\* \* \* \*

CONSIDERED ON BRIEFS
ON APRIL 29, 2019
OPINION FILED **07/24/19**

#28630

KERN, Justice

[¶1.]    Kenneth Hauge (Hauge) appeals his conviction for theft by exploitation in an amount exceeding $5,000. He alleges the circuit court erred by: (1) violating his rights under the Sixth Amendment; (2) denying his motion for a judgment of acquittal; (3) erroneously calculating his restitution order; and (4) imposing a sentence that violates the Eighth Amendment's prohibition against cruel and unusual punishment. We affirm.

## Facts and Procedural History

[¶2.]    On June 6, 2017, Joan Hauge, an 89-year-old woman suffering from dementia, fell off her couch at home and could not get back up. After finding her on the floor, Joan's granddaughter, Marie Hauge, called an ambulance. Joan was admitted to the emergency room of a nearby hospital where she informed her doctors she could "still jump rope and walk to town every day." In reality, Joan's deteriorating physical and mental health prevented her from engaging in much of any physical activity. Ambulance personnel reported finding her in "complete filth," covered in human waste, and in a house not currently "fit for living." The medical professionals who examined her determined that she was unable to care for herself and was not receiving proper care at home. After the incident, Joan's son and primary caregiver, Hauge, discussed with his daughter, Marie, whether they could continue to care for Joan at home. They ultimately decided to place her in a nursing home.

[¶3.]    Approximately a month prior to Joan's fall, Hauge had obtained paperwork to appoint himself as Joan's power of attorney (POA) with Marie as the successor or alternative agent. The language of the POA did not authorize Hauge to

engage in self-dealing. Three days after accepting his role as Joan's POA, Hauge went to the Community Bank of Avon and spoke with Lisa Einrem, an employee of the bank. He directed Einrem to remove his brother's name from Joan's account and create a joint account under his and Joan's names. He then withdrew $6,000, and, of that amount, he deposited $5,500 into his own bank account and took $500 in cash.

[¶4.] In June and July of 2017, Hauge or Marie acting under Hauge's instruction, deposited several bonds at Security State Bank. After the bonds were deposited, Hauge intermittently requested cash withdrawals, which he received. On July 3, he discovered that Joan owned a certificate of deposit (CD) that had matured at Security State Bank worth $30,359.29. Marie suggested that Hauge use these funds to pay Joan's nursing home bill, which was over $14,000 at that time, and save the remaining funds for her future care. Hauge agreed and told Marie that he had opened an account at Palace City Federal Credit Union in Joan's name for this purpose. However, instead of doing so, Hauge cashed in the CD and had Security State Bank give him the funds in the form of a cashier's check, which he deposited in his account. He made a payment to the nursing home in the amount of $14,025 on July 4, 2017,

[¶5.] At the end of July, Marie, who is also an accountant, suspected that Hauge was violating his fiduciary duties as Joan's POA. After filing a complaint with the Department of Social Services, Marie was referred to the Attorney General's Office, who referred the case to the South Dakota Department of Criminal Investigation. On August 1, 2017, Marie removed Hauge as POA and assumed the

role herself. According to Hauge, he was never notified of his removal as Joan's POA. Hauge made a second payment to the nursing home for $8,000 on August 31, 2017, leaving the remaining $8,429.29 from the CD in his account.

[¶6.] Hauge was interviewed by Special Agent Neuharth on September 13, 2017. During the interview, he made a number of incriminating statements. A month later, the Hanson County Grand Jury indicted Hauge for theft by exploitation, a class 4 felony. The indictment alleged he committed the offense between May 1, 2017 and September 1, 2017.

[¶7.] At his arraignment, Hauge waived his right to court-appointed counsel but later accepted the court's decision to appoint advisory counsel to assist him with his case.[1] The circuit court entered an order to that effect on January 18, 2018. The case was tried to a jury in March of 2018. Throughout the trial, Hauge and his advisory counsel questioned witnesses and addressed the jury with Hauge making the opening statement and both addressing the jury during Hauge's closing argument. At the close of the State's case, with the assistance of his advisory counsel, Hauge moved for a judgment of acquittal. The court denied his motion. Hauge then took the stand as part of his case-in-chief and made several incriminating statements when cross-examined by the State. At the close of the evidence, the jury returned a guilty verdict.

[¶8.] Hauge entered an admission to a part II information alleging that he was a habitual offender. Having been convicted of one prior felony, the maximum sentence Hauge could receive was enhanced to that of a class 3 felony. At

---

1.   Hauge's trial counsel is not counsel in this appeal.

sentencing, after considering the testimony and exhibits presented, the circuit court imposed a fifteen-year penitentiary sentence with five years suspended on the condition that Hauge pay restitution in the amount of $31,743.82.

[¶9.]     Hauge appeals, raising four issues for our review, which we restate and reorder as follows:

1.  Whether Hauge's Sixth Amendment rights were violated.

2.  Whether the circuit court erred by denying Hauge's motion for judgment of acquittal.

3.  Whether the circuit court erred in ordering Hauge to pay $31,743.82 in restitution.

4.  Whether Hauge's sentence was cruel and unusual.

**Analysis and Decision**

**1. Whether Hauge's Sixth Amendment rights were violated.**

[¶10.]     Hauge's argument that his Sixth Amendment rights were violated is twofold: (1) he argues the court erred in finding his waiver of his right to counsel was knowing, voluntary, and intelligent; and (2) he claims his court-appointed advisory counsel was ineffective.

[¶11.]     In a criminal case, a defendant has a constitutional right to be represented by counsel, but he also has "an affirmative right of self-representation[.]"[2]  *See Faretta v. California*, 422 U.S. 806, 815, 95 S. Ct. 2525,

---

2.     Despite observing that the historical reasons used to justify a defendant's right of self-representation no longer exist, *see Martinez v. Court of Appeal of California*, 528 U.S. 152, 156–57, 120 S. Ct. 684, 688–89, 145 L. Ed. 2d 597 (2000), the Supreme Court has continued to recognize it as a constitutional right. *See Indiana v. Edwards*, 554 U.S. 164, 171, 128 S. Ct. 2379, 2384, 171 L. Ed. 2d 345 (2008) (addressing the scope of self-representation).

2531, 45 L. Ed. 2d 562 (1975); *see also* S.D. Const. art. VI, § 7. The request to represent oneself must be unequivocal, *see United States v. LeBeau*, 867 F.3d 960, 974 (8th Cir. 2017), and the defendant's waiver of his right to counsel must be voluntary, knowing, and intelligent. *See State v. Van Sickle*, 411 N.W.2d 665, 666 (S.D. 1987). It is the task of the circuit court to determine that a defendant is knowingly and intelligently waiving the right to counsel before permitting a defendant to proceed pro se. *See Van Sickle*, 411 N.W.2d at 667 (citing *State v. Miller*, 248 N.W.2d 61, 63 (S.D. 1976)).

[¶12.] Even though the circuit court repeatedly advised Hauge that he had the right to assistance of counsel, including court-appointed counsel, Hauge explicitly stated that he wished to represent himself. We must determine, then, whether this waiver was knowing, voluntary, and intelligent. For a waiver to meet this standard, a defendant must be advised of the following risks of self-representation in a criminal trial:

> (1) that presenting a defense is not a simple matter of telling one's story, but requires adherence to various 'technical rules' governing the conduct of a trial; (2) that a lawyer has substantial experience and training in trial procedure and that the prosecution will be represented by an experienced attorney; (3) that a person unfamiliar with legal procedures may allow the prosecutor an advantage by failing to make objections to inadmissible evidence, may not make effective use of such rights as the voir dire of jurors, and may make tactical decisions that produce unintended consequences; (4) that a defendant proceeding pro se will not be allowed to complain on appeal about the competency of his representation; and (5) that the effectiveness of his defense may well be diminished by his dual role as attorney and accused.

*Id.* at 666–67.

[¶13.]    At his arraignment, the circuit court asked Hauge whether he wanted the assistance of counsel, and he indicated that he did not.  After discussing the disadvantages of self-representation, the court found Hauge "knowingly, voluntarily, and intelligently waived his right to counsel" and accepted his waiver.

[¶14.]    Two months prior to trial, the State moved the circuit court to appoint advisory counsel to assist Hauge should he change his mind during trial and desire to exercise his right to an attorney.  At a subsequent hearing on the motion, the court, after discussing the *Van Sickle* factors with Hauge, cautioned him:

> **Court:** So, if you represent yourself and if you would get convicted, you can't complain on appeal or a habeas corpus, which is a different type of appeal process later, that you had ineffective assistance of counsel because you chose to represent yourself.  You don't get to blame the attorney when you're your own attorney if things do not go the way you want.
>
> **Hauge:** I understand.

Hauge initially objected to the appointment, but after considering the *Van Sickle* advisement, he agreed to allow advisory counsel to assist him at trial, stating, "Well, the more you talk about it, I guess I would give it a shot."  The court then signed the order appointing advisory counsel for Hauge.

[¶15.]    Despite this advisement, Hauge now argues that allowing him to actively participate in his own representation at trial constituted reversible error because he lacked experience with trial procedure and defense strategy.  For instance, Hauge claims, had he had the benefit of legal training, he would have raised SDCL 22-30A-16 as an affirmative defense to theft by exploitation.  That statute allows a defendant to argue he "[a]cted under an honest and reasonable claim of right to the property involved or . . . had a right to acquire or dispose of the

property as he . . . did." *Id.* For this reason, he claims that the court violated his Sixth Amendment right to counsel by finding his waiver voluntary.

[¶16.] Although the record demonstrates Hauge raised irrelevant issues and made misguided tactical decisions, ultimately, it was Hauge's prerogative to disregard the advice of the circuit court to accept traditional counsel. Hauge instead decided to defend himself at trial with the assistance of advisory counsel. We do not assess his legal competency to defend himself on appeal. Rather, we review his competence to waive the right to counsel. *See United States v. Miller*, 728 F.3d 768, 773–74 (8th Cir. 2013). The record reveals that the circuit court ensured Hauge was fully aware of the pitfalls of self-representation before accepting his waiver. Hauge is competent and literate, and therefore, his decision to forego traditional representation by an attorney was an exercise of his informed free will. The circuit court did not err in finding Hauge's waiver of his right to traditional representation by counsel was voluntary, knowing, and intelligent. *See Van Sickle*, 411 N.W.2d at 666.

[¶17.] In addition to challenging the voluntariness of his waiver, Hauge claims his advisory counsel was ineffective because he allowed Hauge to assume the role of lead counsel and take the witness stand in his own defense. To establish prejudice, Hauge contends that during his testimony, the State extracted additional admissions from him on cross-examination that strengthened its case against him.

[¶18.] "Ineffective-assistance-of-counsel claims are generally not considered on direct appeal." *State v. Thomas*, 2011 S.D. 15, ¶ 23, 796 N.W.2d 706, 714 (citing *State v. Arabie*, 2003 S.D. 57, ¶ 20, 663 N.W.2d 250, 256). Rather, such claims are

best made by filing a petition for a writ of habeas corpus which, if granted, will result in an evidentiary hearing. At such hearing, the record may be developed to allow the attorney "charged with ineffectiveness [to] explain or defend their actions and strategies, and thus a more complete picture of what occurred is available for review." *Arabie,* 2003 S.D. 57, ¶ 20, 663 N.W.2d at 257 (quoting *State v. Dillon,* 2001 S.D. 97, ¶ 28, 632 N.W.2d 37, 48).

[¶19.]     In order to consider his claim on direct appeal, Hauge must demonstrate that trial counsel was "'so ineffective and counsel's representation "so casual" as to represent a "manifest usurpation" of [the defendant's] constitutional rights.'" *See id.* (quoting *Dillon,* 2001 S.D. 97, ¶ 28, 632 N.W.2d at 48). We find no such error here; therefore, Hauge's claims are more appropriately addressed through a petition for habeas corpus.

### 2. Whether the circuit court erred by denying Hauge's motion for judgment of acquittal.

[¶20.]     "We review [a] denial of a motion for judgment of acquittal de novo." *State v. Guthmiller,* 2014 S.D. 7, ¶ 21, 843 N.W.2d 364, 370. "Our task is to determine 'whether the evidence was sufficient to sustain the conviction.'" *Id.* (quoting *State v. Dowty,* 2013 S.D. 72, ¶ 15, 838 N.W.2d 820, 825). In doing this, we assess "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Dowty,* 2013 S.D. 72, ¶ 15, 838 N.W.2d at 825 (quoting *State v. Plenty Horse,* 2007 S.D. 114, ¶ 5, 741 N.W.2d 763, 765).

[¶21.]     Hauge was charged with theft by exploitation pursuant to SDCL 22-46-3, which provides that one:

> having assumed the duty voluntarily, [or] by written
> contract . . . to provide for the support of an elder or an adult
> with a disability, and having been entrusted with the property of
> that elder or adult with a disability, with intent to defraud,
> appropriates such property to a use or purpose not in the due
> and lawful execution of that person's trust, is guilty of theft by
> exploitation.

To constitute a class four felony, the theft must exceed $5,000.  SDCL 22-30A-17.

[¶22.]      Hauge first contends the circuit court erred because the evidence was insufficient to establish that he possessed the requisite intent to commit the crime. Second, he alleges the State failed to prove his theft exceeded $5,000, the statutorily required dollar amount to find him guilty of a class four felony.  Specifically, he argues that, of the sum taken from his mother's accounts, he paid her outstanding real estate taxes in two counties and $22,000 to the nursing home for her health care.

[¶23.]      During its case-in-chief, the State called several witnesses to testify regarding Hauge's withdrawals from Joan's accounts.  Special Agent Neuharth, the lead investigator on the case, testified that he reviewed hundreds of deposits and expenditures from Joan's and Hauge's accounts from May 7, 2017 through August 1, 2017 as part of his investigation.  He created summaries of Hauge's legitimate income and Hauge's withdrawals from Joan's accounts.  As part of his analysis, Agent Neuharth prepared an exhibit that reflected more than $10,200 in cash withdrawals from Joan's accounts and more than $14,800 of suspicious deposits made to Hauge's accounts during the relevant time frame.  He also tracked Hauge's rental payments on his shed and personal expenditures for fuel, restaurants, and at

department stores. Agent Neuharth concluded that Hauge's expenditures far exceeded what he could purchase with his verifiable income.

[¶24.] Agent Neuharth also interviewed Hauge about his activities as Joan's POA, and a recording of the interview was played for the jury. When Agent Neuharth asked Hauge about the $6,000 withdrawn from Community Bank, Hauge admitted to spending the money to pay for his living expenses without using all of the funds for Joan. He also admitted to placing Joan's money in his account on other occasions, telling the officers that there was "probably about $2,000 in there right now for living." He explained, "Basically, I was taking care of myself, helping my kids out with it too a little bit. It's my money, basically. I'm the trustee of the estate."

[¶25.] Additionally, Marie testified about her father's deceptive use of his POA to further his own interests. She testified that Hauge instructed her to deposit savings bonds worth $4,506.92 into Joan's account at Security State Bank in Alexandria and bring back $500 in cash so that he could pay Joan's water bill. Although, she confirmed that he did pay the bill, Agent Neuharth testified that Hauge withdrew an additional $3,500 from the account a few days later. When questioned about these funds, Hauge admitted using them for his living expenses, to help acquaintances pay for a motel room in Mitchell, and to assist his children. He also deposited $400 into his own account. At the close of evidence, the court instructed the jury that it could consider the withdrawals established by the

evidence in the aggregate to determine whether the State met its burden of proving theft by exploitation in excess of $5,000.[3]

[¶26.] Based on our review of the record, there was more than sufficient evidence to sustain the jury's verdict finding Hauge guilty of theft by exploitation in an amount exceeding $5,000 and of his intent to defraud Joan. Hauge admitted to the jury that he did not review the POA "as good as [he] should" have and that he thought that it gave him "pretty much free reign," to "intermingl[e] . . . funds[.]" He explained to the jury that he did not intend to defraud his mother but was under the "mistaken assumption that once you have the power of attorney, you don't really have to be . . . accountable to your relatives." When discussing the specific transactions, he stated: "I admit I got carried away. It's fun to have a little cash in my pocket."

[¶27.] We also find unpersuasive Hauge's argument that the record contains insufficient evidence to establish he committed theft exceeding $5,000. Hauge's transaction at Community Bank in Avon, in which he withdrew $6,000 under the pretense of needing money to pay Joan's bills, in and of itself exceeds this threshold. In the end, it was the jury's responsibility to resolve conflicts in the evidence, weigh the credibility of the witnesses, and decide for itself the truth regarding Hauge's conduct. *See Dowty*, 2013 S.D. 72, ¶ 15, 838 N.W.2d at 825. The circuit court did not err by denying Hauge's motion for a judgment of acquittal.

### 3. Whether the circuit court erred in ordering Hauge to pay $31,743.82 in restitution.

---

3. Instruction 18 provided: "Amounts involved in thefts, whether from the same person or several persons, committed pursuant to one scheme or course of conduct, may be aggregated in determining the degree of the offense."

[¶28.]    "It is the policy of this [S]tate that restitution shall be made by each violator of the criminal laws to the victims of the violator's criminal activities to the extent the violator is reasonably able to do so." SDCL 23A-28-1. However, to impose a restitution order, a defendant must be advised that his sentence could include restitution. *See State v. Wilson*, 459 N.W.2d 457, 460 (S.D. 1990). When a defendant "object[s] to the amount of restitution requested[,]" he is entitled to "a hearing to determine the proper amount[.]" *State v. Tuttle*, 460 N.W.2d 157, 160 (S.D. 1990).

[¶29.]    At his arraignment, Hauge was advised that, if convicted, he could be required to pay restitution. When Hauge and his advisory counsel appeared at his sentencing hearing, Hauge did not object to the State's request for $31,743.82 in restitution as set forth in the presentence investigation report. When specifically asked by the court if he had additions or corrections to the report, Hauge indicated that he had none.

[¶30.]    Even though Hauge told the court during his allocution that there had "been some creative bookkeeping here in order to come up with $31,000," he did not request a hearing to contest the amount, present evidence establishing that the calculation was incorrect, or specifically alert the circuit court about his concern. Instead, prior to the imposition of sentence, Hauge called his son to testify about his efforts to raise money to pay Hauge's restitution by selling property and cashing in life insurance policies. Nevertheless, on appeal, Hauge now claims the circuit court erred in ordering restitution because he alleges the order does not account for the payments he made to the nursing home and funds he paid to the county for Joan's

real estate taxes.[4]  He contends the State did not present sufficient evidence to support the restitution request.

[¶31.]     Because Hauge failed to object to the restitution amount, he has waived the issue on appeal.  *See State v. Roedder,* 2019 S.D. 9, ¶ 11 n.2, 923 N.W.2d 537, 542 n.2.  Further, we decline to exercise our discretion to consider his claim under plain error review because this standard must be "applied cautiously and only in exceptional circumstances."  *State v. Bausch,* 2017 S.D. 1, ¶ 27, 889 N.W.2d 404, 412.  Prior to imposing restitution in this case, the circuit court considered the exhibits at trial and heard the detailed testimony of Agent Neuharth summarizing Hauge's financial transactions.  Courts possess "broad discretion in imposing restitution." *State v. Hofer,* 2008 S.D. 109, ¶ 12, 757 N.W.2d 790, 794.  In this case, the circuit court's restitution order does not meet the necessary standard to warrant review for plain error.  *See State v. Nelson,* 1998 S.D. 124, ¶ 7, 587 N.W.2d 439, 443.

### 4. Whether Hauge's sentence was cruel and unusual.

[¶32.]     Hauge asserts that his sentence violates the Eighth Amendment's prohibition against cruel and unusual punishment.  U.S. Const. amends. VIII, XIV.  Although Hauge relies upon the "shocks the conscience" test outlined in *State v. Shilvock-Havird,* 472 N.W.2d 773, 779 (S.D. 1991), we have since clarified the

---

4.     It is clear from the record, however, that the circuit court was aware of Hauge's legitimate expenditures of Joan's funds.  In pronouncing sentence, the circuit court specifically noted that Hauge "did pay the three months to the nursing home."  Further, during the trial both the State and Hauge introduced evidence of the checks properly written to pay Joan's real estate taxes in Bon Homme and Hanson counties.

correct standard of review in *State v. Rice*, 2016 S.D. 18, ¶ 13, 877 N.W.2d 75, 80

and *State v. Chipps*, 2016 S.D. 8, ¶¶ 33–38, 874 N.W.2d 475, 487–89.

[¶33.]     The proper inquiry when assessing "whether a noncapital sentence

violates the Eighth Amendment requires us to determine de novo whether the

sentence imposed is grossly disproportionate to its corresponding offense." *Rice*,

2016 S.D. 18, ¶ 13, 877 N.W.2d at 80.  Our analysis involves a comparison of "the

gravity of the offense—i.e., the offense's relative position on the spectrum of all

criminality—to the harshness of the penalty—i.e., the penalty's relative position on

the spectrum of all permitted punishments." *Id.* (citations omitted).  In accordance

with this standard, we do not limit our review to the penalties available for theft by

exploitation when comparing Hauge's sentence to other penalties.  Instead, we

consider the harshness of Hauge's sentence across all punishments available under

the laws of this state.  *See id.* ¶ 15, 877 N.W.2d at 81.

[¶34.]     If, in our review of the penalties, we conclude the punishment appears

"grossly disproportionate to the gravity of the offense, then we will compare the

sentence to those 'imposed on other criminals in the same jurisdiction' as well as

those 'imposed for commission of the same crime in other jurisdictions.'" *Chipps*,

2016 S.D. 8, ¶ 38, 874 N.W.2d at 489 (quoting *Solem v. Helm*, 463 U.S. 277, 291, 103

S. Ct. 3001, 3010, 77 L. Ed. 2d 637 (1983)).  "The challenged sentence is cruel and

unusual only if these comparisons 'validate [the] initial judgment that [the]

sentence is grossly disproportionate to [the] crime.'" *Rice*, 2016 S.D. 18, ¶ 13, 877

N.W.2d at 80 (quoting *Helm*, 463 U.S. at 291, 103 S. Ct. at 3010).

[¶35.] The gravity of Hauge's offense is significant when viewed on the spectrum of criminality. Commission of any felony is a serious matter. Although Hauge's offense is not a crime of violence, theft by exploitation is particularly insidious in that it involves the manipulation of disabled or elderly adults, a particularly vulnerable population. This is especially so because the victim is often dependent on the thief for help and support. Victims who are elderly and in poor mental or physical health are largely defenseless against such crimes. Exploiting the elderly for financial gain wreaks havoc not only on the victim but in many cases the entire family, often irreparably destroying familial bonds. Financial exploitation of a vulnerable adult is therefore a serious offense when weighed against other types of crimes.

[¶36.] As for the harshness of Hauge's sentence, the court ordered a fifteen-year sentence, with five years suspended, on the condition that Hauge pay restitution. It also ordered that his sentence run consecutively to the term he is currently serving due to a parole revocation for another offense.

[¶37.] Theft by exploitation in an amount exceeding $5,000 but less than or equal to $100,000 is ordinarily a class four felony punishable by up to ten years imprisonment and/or up to a $20,000 fine. *See* SDCL 22-30A-17; SDCL 22-6-1(7). However, as a habitual offender pursuant to SDCL 22-7-7, Hauge's offense was enhanced to a class three felony, for which the maximum punishment is fifteen years imprisonment, a $30,000 fine, or both. *See* SDCL 22-6-1(6). The circuit court's sentence, while stern, does not exceed the punishment prescribed by our

Legislature. Additionally, if Hauge pays restitution as ordered, five years of his sentence will be suspended.

[¶38.] When viewed on the spectrum of all permitted punishments, including the potential of death and mandatory life imprisonment for higher-level felonies, Hauge's penalty for stealing thousands of dollars from his sick and elderly mother is far lower than the harshest possible sentence. Accordingly, Hauge's "sentence does not appear to be grossly disproportionate." *See Rice*, 2016 S.D. 18, ¶ 15, 877 N.W.2d at 81. "If the threshold requirement of gross disproportionality is not met, the analysis under the Eighth Amendment ends." *State v. Traversie*, 2016 S.D. 19, ¶ 15, 877 N.W.2d 327, 332. Therefore, we accord no further review to Hauge's constitutional challenge. We affirm.

[¶39.] GILBERTSON, Chief Justice, and JENSEN and SALTER, Justices, and WILBUR, Retired Justice, concur.