#28830, #28844-a-JMK
**2020 S.D. 11**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

#28830

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

v.

DANIEL CEPLECHA,                    Defendant and Appellant.

--------------------------------------------------------------------------------------------------------------------

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

#28844

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

v.

RANGLER CEPLECHA,                    Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SIXTH JUDICIAL CIRCUIT
BENNETT COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE BOBBI J. RANK
Judge

* * * *

CONSIDERED ON BRIEFS ON
AUGUST 26, 2019
OPINION FILED **03/04/20**

JASON R. RAVNSBORG
Attorney General

PAUL S. SWEDLUND
Assistant Attorney General
Pierre, South Dakota

CLINT L. SARGENT
RALEIGH E. HANSMAN of
Meierhenry Sargent LLP
Sioux Falls, South Dakota

KRISTI L. JONES of
Dakota Law Firm, Prof. LLC
Sioux Falls, South Dakota

Attorneys for plaintiff
and appellee.

Attorneys for defendant
and appellant, Daniel Ceplecha.

Attorney for defendant
and appellant, Rangler
Ceplecha.

#28830, #28844

KERN, Justice

[¶1.]      Daniel Ceplecha and his son, Rangler, pled guilty to first-degree manslaughter pursuant to a plea agreement.  Prior to sentencing, Daniel and Rangler moved to withdraw their pleas, claiming they acted in self-defense.  They also requested appointment of substitute counsel.  The circuit court denied their motions and sentenced each defendant to life in prison.  Daniel and Rangler filed separate appeals, which we consolidate.  We affirm.

**Facts and Procedural History**

[¶2.]      The following facts are derived from State's exhibit one, which included police reports (containing statements from the State's key witness, Wiley Yellow Hawk, to investigating officers), the grand jury transcripts, the autopsy report, and the affidavits in support of search warrants.  Throughout the evening of November 11, 2016, and into the early morning hours of November 12, 2016, Daniel, his son, Rangler, and the victim, Moses Red Bear, were drinking at the Ceplechas' home in Martin, South Dakota.  Daniel became enraged with Red Bear because he believed Red Bear had stolen $40, a pocket knife, and a flashlight from him.  Even though Rangler told Daniel that the items were in the house, Daniel continued to accuse Red Bear of stealing them.

[¶3.]      Shortly after midnight, Wiley Yellow Hawk walked to the Ceplechas' house for a visit.  As Yellow Hawk approached the house, he could hear Daniel and Rangler yelling at Red Bear when a shot rang out.  From his vantage point next to a sliding glass door, Yellow Hawk saw Daniel sitting in a chair in the living room holding a silver .32 caliber revolver in his hand.  Red Bear sat across the room from Daniel.

-1-

[¶4.]    Daniel noticed Yellow Hawk standing outside and waved him in. Yellow Hawk sat down in the living room and saw that Red Bear's face was bleeding as if he had been punched. Yellow Hawk observed Daniel and Rangler verbally abusing Red Bear and heard Daniel promise Red Bear that the situation would "get uglier" if he did not replace the missing property. Red Bear insisted that he did not take the items. Yellow Hawk heard Rangler ask Daniel, "Why the f**k are we doing this tonight? We could of did [sic] it tomorrow or whenever instead of when people are around."

[¶5.]    The argument intensified between Daniel and Red Bear. Rangler fired three shots into the ceiling. Daniel yelled at him and asked him why he fired the gun. Rangler replied that he was "pissed right now." Yellow Hawk then witnessed Daniel shoot Red Bear in the left hand. Red Bear told Daniel he was not afraid to die and that it was just another step. He made no attempt to defend himself. Yellow Hawk excused himself to the bathroom, and Daniel told him to stay in there.

[¶6.]    While inside the bathroom, Yellow Hawk heard a shot and Red Bear moaning and gargling as though he was dying. At some point, Rangler asked Daniel if they were going to need plastic, to which Daniel replied, "Yes." Shortly thereafter, Yellow Hawk heard Rangler exclaim: "You shot him in the lungs. You going to let him suffocate like that? This is how it's done[,]" followed by Rangler asking Red Bear, "Can you hear me Moses before you go into deep darkness[?]" Additional gunshots followed. After a pause, Yellow Hawk overheard Daniel ask Rangler if they should "take care of the other guy in the bathroom." To that,

Rangler replied: "No. He didn't see nothing [sic]. Open the door so I can take this body out to the van."

[¶7.]       Daniel and Rangler took Red Bear's body to their van and returned to the house. They demanded that Yellow Hawk assist them in cleaning up Red Bear's blood and gave him a trash can filled with water and a sponge covered in bleach. While Yellow Hawk was cleaning up the blood, Daniel and Rangler asked if they could trust him. Yellow Hawk assured them that he would not talk and that he was trustworthy. Daniel told him they would kill him if he told anyone.

[¶8.]       Around 2:00 a.m., Daniel and Rangler left to dispose of Red Bear's body. As soon as they were gone, Yellow Hawk fled to his mother's house and told her what had happened. She called the police and Officer Thomas Chester responded. Yellow Hawk, who was distraught, gave a detailed description of the events leading up to Red Bear's death and his role in cleaning up the blood. Officer Chester could detect the smell of bleach on Yellow Hawk's hands and arms.

[¶9.]       Based on Yellow Hawk's report, dispatch routed officers to the Ceplechas' home to investigate and secure the crime scene. Soon after their arrival, it became apparent to the officers that the Ceplechas' driveway had recently been cleaned with bleach. Dispatch issued a broadcast requesting an attempt to locate the Ceplechas' vehicle, a green Ford Windstar van bearing South Dakota plates.

[¶10.]       Around the time that Yellow Hawk reported the crime, Daniel and Rangler were at Fresh Start, a convenience store in Martin. Video surveillance showed Daniel and Rangler purchasing gas for their van and filling up a can with

gas. They also bought sandwiches, coffee, and a lighter before leaving the store around 2:30 a.m. and proceeding west on Highway 18.

[¶11.] Video footage from the Fresh Start captured the Ceplechas' van returning from the east, traveling towards the store at approximately 4:00 a.m. Upon arrival, Daniel and Rangler bought coffee and visited with the clerk. While the Ceplechas were inside, law enforcement officers observed their van in the parking lot and entered the store to investigate. When Daniel saw the officers, he informed them that he was armed. Officers removed a .32 caliber revolver from his left pocket. They observed that Daniel and Rangler were dirty and that Daniel had a reddish-brown substance consistent with blood on his shoes. Daniel and Rangler were arrested and taken into custody.

[¶12.] During the search incident to Rangler's arrest, officers removed a .22 caliber round, a book of matches, and a lighter from his pockets. While taking his clothing into evidence, they noticed that there were two spots of what appeared to be blood on his shirt. Officers later obtained a search warrant for the Ceplechas' home and van. The search of the van revealed a loaded .22 caliber handgun, ammunition for both a .22 and .32 revolver, a deflated air mattress, and other items that appeared to have a significant amount of fresh blood on them.

[¶13.] Shortly after 6:30 a.m., firefighters, responding to reports of a grass fire, discovered Red Bear's body in rural Bennett County not far from Highway 18. His body had been dumped on the side of a road, soaked in gasoline, and set ablaze. Part of the ditch was still smoldering when police arrived on the scene. Red Bear's body was transported to Rapid City for an autopsy.

[¶14.]      Division of Criminal Investigation (DCI) agents and forensic crime scene specialists were summoned to assist with collecting evidence from the Ceplechas' house and curtilage.  The evidence team found a trash can filled with bleach water, sponges, and a half-empty container of bleach outside of the house.  As part of their examination of the driveway, the investigators used a blood revealer, commonly called Bluestar or Luminol, to detect traces of blood not visible to the naked eye.  This substance uncovered a trail of blood going from the driveway through the carport and into the residence through the sliding glass door.

[¶15.]      DCI Agent Jeff Goble interviewed Daniel at the Bennett County Sheriff's Office.  After waiving his rights, Daniel told him that several people were at his house the night before drinking whiskey, and that he and Rangler were drinking with them.  All of the guests left except for Red Bear, who had been staying in his home for a couple of weeks "mooching off of them."[1]  Daniel said that he discovered that Red Bear had stolen items from him.  He claimed that he had asked him to leave, but Red Bear returned ten minutes later and "plopped down in the house like he belonged there."  Daniel admitted to punching him in the nose, causing it to bleed.  Daniel claimed that following this, he blacked out and had no further memories of the evening until he was arrested at the Fresh Start.  Rangler chose not to speak with the officers.

[¶16.]      Dr. Donald Habbe performed the autopsy, which revealed that Red Bear had been shot seven or eight times.  The bullet wounds included: one possible

---

1.      Another man was also present in the home on the night of the killing, but was passed out due to excessive alcohol consumption.

shot to the left hand, which was badly damaged by the fire; two shots to the right thigh, three to the chest and abdomen, and two to the head—one between Red Bear's eyes and the other behind his right ear. The wounds appeared to be caused by .22 and .32 caliber weapons. The .32 caliber bullet was found in the chest and the .22 bullets, in the head, abdomen, and thigh.

[¶17.] On November 14, 2016, Daniel and Rangler were jointly indicted on alternative counts of first- and second-degree murder and for conspiracy to commit murder for their respective roles in Red Bear's death. The court appointed separate counsel for each defendant. More than a year later, Daniel and Rangler entered into written plea agreements with the State. In exchange for their guilty pleas to first-degree manslaughter, the State agreed to dismiss the murder and conspiracy charges. By the terms of the written agreement, all parties acknowledged that the court was free to exercise its discretion at sentencing and could impose a sentence up to the statutory maximum of life in prison.

[¶18.] On February 28, 2018, the court held a joint change-of-plea hearing with Daniel and Rangler and their respective attorneys. Before accepting their guilty pleas to first-degree manslaughter, the court questioned each defendant at length to assess their knowledge and understanding of the agreements and the voluntariness of their respective decisions to waive their constitutional rights. The parties agreed that for purposes of establishing a factual basis, the circuit court could rely on State's exhibit one.

[¶19.] The court engaged in an individual colloquy with each defendant and each defendant's counsel to ensure that they understood their rights and were

acting of their own free will. Thereafter, Daniel and Rangler entered pleas of guilty to first-degree manslaughter. The court ordered presentence investigations and set the cases for sentencing on June 6, 2018.

[¶20.] On May 9, 2018, Daniel and Rangler submitted a joint handwritten and notarized letter to the court and their attorneys expressing their desire to withdraw their guilty pleas and obtain substitute counsel. On June 6, 2018, the court held an evidentiary hearing to address the Ceplechas' pro se motions for new counsel. After considering testimony from each defendant regarding the adequacy of their counsel's representation, the court denied the motions. It then gave Daniel and Rangler the opportunity to meet with their attorneys to confirm their continued desire to withdraw their guilty pleas. Daniel and Rangler decided to proceed and requested a hearing on their motions to withdraw.

[¶21.] The court held a hearing on July 16, 2018, to address their motion to withdraw their pleas. Daniel and Rangler testified that they were not guilty of the charges against them. Daniel told the court that he acted in self-defense. According to Daniel, Red Bear began swinging a .45 caliber gun at him, and Daniel "gave him a chance to stop more than once" before shooting him. On cross examination, Daniel acknowledged that he lied to the officers when he told them that he blacked out after punching Red Bear in the face. He admitted that he actually remembered the incident.

[¶22.] Additionally, Daniel testified that the State "used evidence to make up charges" and failed to disclose evidence in his case. As an example of undisclosed evidence, he claimed that he told DCI Agent Goble that on the night of the killing,

he had physically removed Red Bear from his house and told him not to come back, but that Red Bear returned ten minutes later. Daniel claimed this statement was missing from his tape-recorded interview. Daniel also told the court that he wished to avoid a mandatory life sentence by entering the plea.

[¶23.] Rangler's testimony also centered around his theory that he acted in self-defense. Rangler told the court that he shot Red Bear multiple times "in defense of [his] home, [his] family, and the people in [his] house." When asked why he needed to defend himself, Rangler told the court that Red Bear was "waving a .45 when he was shot." He also testified that even though he gave his version of the events to the court services officer during the preparation of the presentence report, the officer did not believe him. This led Rangler to conclude he would receive a maximum sentence. He told the court that he only accepted the plea because he feared serving a life sentence. Rangler also stated that his attorney advised him that accepting the State's plea agreement was in his best interest. When questioned regarding how his attorney had given him bad advice, Rangler replied, "Suppose it wasn't." When asked, Rangler was unable to think of any way in which his counsel's performance was defective.

[¶24.] The circuit court denied Daniel's and Rangler's motions, finding that their pleas were knowingly and voluntarily made. Based on a review of the totality of the circumstances, the court concluded that they had failed to meet their burden of proving a fair and just reason to withdraw their pleas. The court also found that to allow withdrawal of their pleas just prior to sentencing would constitute a waste of judicial resources. It scheduled a sentencing hearing for November 30, 2018.

[¶25.]    At the sentencing hearing, the court indicated that it had acquired a thorough acquaintance with the character and history of both defendants through the presentence report. The court also considered numerous victim impact letters and statements from three members of Red Bear's family. In its remarks, the court separately discussed the defendants' ages, limited criminal histories, mental health, and propensity to keep guns, swords, axes, and knives all over the home and around them at all times.

[¶26.]    The court noted that according to the presentence report, Daniel admitted to firing three shots from his .32 caliber revolver that night. The court recounted the statement Rangler made after Daniel shot Red Bear in the chest, leaving him struggling to breathe. Rangler stated, "This is how it's done" before shooting Red Bear in the head. The court noted that, in total, Rangler admitted to firing nine shots from his .22 caliber gun, which likely included the shot between Red Bear's eyes. Among the court's final comments prior to declaring the sentences, the court observed that "the motivating factor behind this entire incident was a knife and a flashlight and maybe a small amount of money." It sentenced Daniel and Rangler each to life in prison without parole. Both filed separate appeals.[2] Because two of their issues on appeal are identical and their cases involve review of the same record, we consolidate their appeals and assignments of error as follows:

[¶27.]    Rangler raises the following issue for our review.

> 1. Whether the circuit court abused its discretion by denying his motion for appointment of substitute counsel.

---

2.    Appellate counsel for the defendants were not involved in the trial court proceedings.

[¶28.]     Daniel and Rangler raise the following issues for our review:

2. Whether the circuit court abused its discretion in denying Daniel's and Rangler's motions to withdraw their guilty pleas.

3. Whether the circuit court erred by imposing life sentences.

**Analysis and Decision**

**1.     Whether the circuit court abused its discretion by denying Rangler's motion for appointment of substitute counsel.**

[¶29.]     Typically, "a voluntary and intelligent plea of guilty waives a defendant's right to appeal all nonjurisdictional defects in the prior proceedings." *State v. Cowley*, 408 N.W.2d 758, 759 (S.D. 1987). Any alleged error associated with a circuit court's denial of a request for substitute counsel is generally deemed non-jurisdictional. *See, e.g., United States v. Lujan*, 536 Fed. Appx. 820, 822 (10th Cir. 2013). However, the waiver rule does not generally apply to a defect that occurs after the defendant's guilty plea. *See United States v. Porter*, 405 F.3d 1136, 1144 (10th Cir. 2001). This is because a defendant cannot waive an error that he is unaware of or has not yet occurred at the time of his plea. Rangler moved for substitute counsel *after* he entered his guilty plea. Our initial task, then, is to determine whether the alleged defects in representation occurred before Rangler pled guilty or after his plea. If it is the former and Rangler knew of the defects, his claims are waived. If the alleged defects occurred after the plea, his claims are preserved.

[¶30.]     Our answer requires that we examine the factual circumstances giving rise to his claim.[3] Rangler was indicted on November 14, 2016, and counsel was appointed the following day. In early 2018, the State offered Rangler a plea agreement, which he accepted by pleading guilty on February 28, 2018. On May 9, 2018, about a month before the sentencing hearing, Rangler and Daniel jointly submitted a handwritten letter indicating that they wished to fire their attorneys and withdraw their pleas of guilty. They informed the court that they "were forced to make" their pleas, were "not guilty of the charges," and had "been horribly misrepresented." In their letter, they also contended that it was unfair that the State had three lawyers while they each had only one. Rangler refused to speak to his lawyer after the letter was issued.

[¶31.]     Rangler testified at the evidentiary hearing in support of his motion for substitution of counsel. He told the court that his attorney refused to listen to him. As his basis for this statement, he informed the court that his lawyer subjected him to a competency evaluation against his wishes. He also referenced his concern that the State's lawyers outnumbered his lawyer. The court denied Rangler's motion. Because these alleged errors by counsel occurred prior to Rangler's guilty plea, they are waived and not reviewable on direct appeal. *Cowley*, 408 N.W.2d at 759.

[¶32.]     But even if they were not waived, Rangler has failed to show that the circuit court abused its discretion by denying his motion. "Appointment of

---

3.     Even though the circuit court denied Daniel's request for substitute counsel, he does not challenge that determination on appeal.

substitute counsel is warranted only upon a showing of good cause and where substitution will not unreasonably disrupt the judicial process." *State v. Irvine*, 1996 S.D. 43, ¶ 9, 547 N.W.2d 177, 180. Good cause exists when there is "a destruction of communication and a breakdown in the attorney–client relationship[.]" *State v. Talarico*, 2003 S.D. 41, ¶ 23, 661 N.W.2d 11, 20.

[¶33.] The defendant bears the burden of demonstrating that a change of counsel is necessary. *State v. Martinez*, 2016 S.D. 49, ¶ 15, 882 N.W.2d 731, 735. "When a defendant alleges the existence of a dispute leading to a destruction of communication and a breakdown in the attorney-client relationship, the [court] is obligated to inquire whether such allegations are true." *Irvine*, 1996 S.D. 43, ¶ 9, 547 N.W.2d at 180. Likewise, "[w]hen a defendant asserts that his assigned lawyer is not adequate or diligent" or "is disinterested, the [court] should hear his claim and, "if there is a factual dispute, take testimony and state [it's] findings and conclusions." *Id.* The court followed these procedures entering detailed findings of fact and conclusions of law after considering Rangler's testimony. We review the circuit court's denial of a motion to substitute counsel for an abuse of discretion. *Id.*

[¶34.] Although Rangler requested new counsel, he has not established that the alleged breakdown in his relationship with his attorney materially impacted his "trial strategy or a substantial defense" he wished to raise. *Id.* ¶ 14, 547 N.W.2d at 181. In fact, immediately before Rangler pled guilty to first-degree manslaughter, Rangler told the circuit court that he was satisfied with the performance of his counsel. He also informed the court that his attorney had adequately explained the terms of the State's plea agreement to him. Even after Rangler submitted his letter

to the court indicating that he wished to withdraw his plea, his attorney continued to advocate for him by filing a brief in support of his motion and zealously arguing that the plea be withdrawn.

[¶35.] There is no evidence in the record that Rangler's attorney refused to follow his directions or was unavailable to him. In its findings, the court noted that because Rangler had court appointed counsel, it had reviewed counsel's vouchers and hourly billings, which reflected that his counsel had dedicated substantial time to his case. Based on its observations throughout the proceedings, the court found that Rangler's counsel "vigorous[ly]" defended him by becoming "painstakingly familiar" with the facts of the case and potential motions and defenses.

[¶36.] With respect to counsel's decision to pursue a competency evaluation, the circuit court found that Rangler's attorney "acted in the best interests of his client" by requesting the evaluation which the court ordered. The evaluation, which ultimately found Rangler competent to proceed, may not have been something Rangler wished to undergo. However, as the court noted, the evaluation was necessary because "an incompetent defendant cannot be legally tried."

[¶37.] To the extent that communication broke down between Rangler and his attorney, the court, relying on *Irvine*, concluded that it did not occur because of an "irreconcilable dispute[,]" but rather because of Rangler's "refusal to communicate or cooperate with [his] attorney." *See id.* ¶¶ 13–14, 547 N.W.2d at 181. "[A] defendant is not entitled to substitution of counsel where the breakdown in the attorney/client relationship is caused by his own refusal to cooperate with his attorney." *Id.* ¶ 15, 547 N.W.2d at 182. Additionally, at the time of Rangler's

request, over a year and a half had passed since the date of the original appointment of counsel and more than two months had lapsed since the entry of his guilty plea. While Rangler may have desired a "do over" after he entered his plea, he has failed to establish good cause for his request for new counsel. As the court noted, appointing new counsel "to start from scratch would be a clear disruption of the judicial process." Based on our review of the record, it is apparent that the circuit court did not abuse its discretion when it denied Rangler's motion for substitute counsel.

### 2. Whether the circuit court abused its discretion in denying Daniel's and Rangler's motions to withdraw their guilty pleas.

[¶38.]    After pleading guilty, a defendant may make a "motion to withdraw a plea of guilty . . . before sentence is imposed or imposition of sentence is suspended[.]" SDCL 23A-27-11. When the motion is made prior to sentencing "a court should exercise its discretion liberally in favor of withdrawal." *State v. Kvasnicka*, 2016 S.D. 2, ¶ 8, 873 N.W.2d 705, 708. *See also State v. Thielsen*, 2004 S.D. 17, ¶ 15, 675 N.W.2d 429, 433; *State v. Bailey*, 1996 S.D. 45, ¶ 12, 546 N.W.2d 387, 391.

[¶39.]    Yet, "a defendant does not have an automatic right to withdraw a guilty plea[.]" *Kvasnicka*, 2016 S.D. 2, ¶ 8, 873 N.W.2d at 708. A defendant must establish that his request is based on "more than the mere desire to have a trial." *Bailey*, 1996 S.D. 45, ¶ 13, 546 N.W.2d at 391. He must show a "fair and just" reason for withdrawing a guilty plea. *United States v. Hyde*, 520 U.S. 670, 671, 117 S. Ct. 1630, 1631, 137 L. Ed. 2d 935 (1997).

[¶40.]    Whether a defendant has stated a fair and just reason implicates a number of non-exclusive considerations, including: "whether the defendant knowingly and voluntarily pleaded guilty; whether the defendant asserts [he] is innocent; delay between the defendant's plea and request for withdrawal of the plea; whether the defendant received competent assistance of counsel in making the decision to plead guilty; whether withdrawing the plea will prejudice the prosecution of the defendant; and whether withdrawing the plea will waste judicial resources[.]" *Kvasnicka*, 2016 S.D. 2, ¶ 9, 873 N.W.2d at 709.

[¶41.]    As we stated in *Kvasnicka*, "this is hardly a checklist." *Id.* Indeed, because a defendant no longer enjoys the presumption of innocence after pleading guilty, the defendant bears the burden of production and persuasion. *State v. Schmidt*, 2012 S.D. 77, ¶ 16, 825 N.W.2d 889, 894; *Thielsen*, 2004 S.D. 17, ¶ 19, 675 N.W.2d at 434. Moreover, "[t]he ultimate determination of whether a defendant has presented a fair and just reason to withdraw a guilty plea is left to the sound discretion of the trial court; we will set aside such a determination only when it constitutes an abuse of discretion." *Kvasnicka*, 2016 S.D. 2, ¶ 9, 873 N.W.2d at 709. "An abuse of discretion is a fundamental error of judgment, a choice outside the reasonable range of permissible choices, a decision, which on full consideration is arbitrary or unreasonable." *Bingham Farms Trust v. City of Belle Fourche*, 2019 S.D. 50, ¶ 23, 932 N.W.2d 916, 922.

[¶42.]    Here, Daniel and Rangler assert that the circuit court abused its discretion in denying their motion because they were coerced into entering guilty pleas. They also argue that their guilty pleas are contrary to the truth because they

are actually innocent. Rangler argues that the State has failed to produce evidence to show how it would be prejudiced if he were permitted to withdraw his plea. We separately examine each claim.

### *Voluntariness of the pleas*

[¶43.]     Daniel asserts that his plea was involuntary because incarceration restricted his ability to see his son and not seeing his son caused him significant separation anxiety. He also claims that he did not voluntarily plead guilty because he was improperly led to believe that he could be housed with Rangler after the case was concluded. In addition, he alleges he was motivated by the possibility of avoiding a mandatory life sentence. Finally, he claims that in the interest of justice, he should be permitted to withdraw his plea because he is actually innocent. To support his claim of innocence, he contends that DCI Agent Goble omitted from his report a statement Daniel made regarding removing Red Bear from the Ceplecha home and that Red Bear returned although he was not welcome there. Daniel alleges that this statement substantiates his claim of self-defense.

[¶44.]     Rangler also argues that he pled guilty to be housed with his father, but also takes an inconsistent position that the joint plea hearing robbed him of his ability to voluntarily plead guilty. He further contends his plea was involuntary because the court addressed his father first throughout the proceedings and Rangler had a heightened susceptibility to his father's influence and was rendered incapable of making an independent decision.

[¶45.]     "A plea is intelligent and voluntary when the accused has a full understanding of his constitutional rights and, having that understanding, waives

those rights by a plea of guilty." *State v. Olson*, 2012 S.D. 55, ¶ 19, 816 N.W.2d 830, 836. In order for a plea to be voluntary, a defendant must "be advised of his rights relating to self-incrimination, trial by jury, and confrontation[.]" *Id.* After this advisement, the defendant must "intentionally relinquish or abandon [those] known rights." *Id.* If the record demonstrates "that the defendant understood his rights" and the consequences of his guilty plea, we will find that the defendant's plea was "entered intelligently and voluntarily." *Id.* ¶ 20, 816 N.W.2d at 836. Because the record "must affirmatively show the plea was voluntary[,]" we review the circumstances of each plea in its entirety to determine whether they each "understood the consequences of pleading guilty[.]" *Monette v. Weber*, 2009 S.D. 77, ¶ 10, 771 N.W.2d 920, 925.

[¶46.]     At the time of the change-of-plea hearing, Daniel was 57 years old and had completed eleventh grade before dropping out of high school. Daniel's prior encounters with the criminal justice system were limited to a conviction for insufficient funds in 2004 and speeding tickets. He was represented by separate counsel at all critical stages of his case. The record reveals the court advised Daniel of his constitutional rights and ensured he understood he was abandoning those rights by accepting the State's plea agreement and pleading guilty. Daniel confirmed that he had reviewed the terms of his written plea agreement with his attorney and understood them. He also told the court that he was satisfied with the services of his attorney. When the court explained the elements of first-degree manslaughter to Daniel, he indicated that he understood the elements and the State's burden of proof.

[¶47.]     The court also reviewed each of Daniel's constitutional rights with him. Daniel, with his attorney by his side, responded that he understood each of these rights and affirmed that he was voluntarily waiving his rights by pleading guilty. The court asked him if he admitted to "caus[ing] the death of Moses Red Bear with a dangerous weapon, that being a .32 caliber handgun[,]" without any design to affect the death. To this Daniel replied, "Yes, your Honor." The court found Daniel's wavier knowing, voluntary, and intelligent and accepted his guilty plea to manslaughter.

[¶48.]     The court then addressed Rangler's request to change his plea. Rangler was 23 years old and had an eighth-grade education. Like Daniel, Rangler's prior interactions with the criminal justice system were limited. He was convicted of possession of alcohol by a minor in 2014 and was prosecuted for driving without a license in 2015. Rangler was represented by separate counsel during all stages of the prosecution.

[¶49.]     The court's colloquy with Rangler is nearly identical to Daniel's. After the circuit court meticulously reviewed Rangler's written plea agreement and constitutional rights, Rangler assured the court that he understood the agreement and had reviewed the terms with his attorney prior to agreeing to plead guilty. He also stated that he was satisfied with his counsel, understood the elements of the crime, and his rights. When asked whether he understood that pleading guilty to manslaughter meant he was waiving these rights, Rangler responded in the affirmative. The court also asked Rangler if he had been forced or coerced to enter his plea or if any promises had been made to him other than those contained in the

plea agreement. Rangler assured the court that he was entering into the agreement of his own volition.

[¶50.] After Rangler entered his plea of guilty, the court inquired of him, do "you admit that you caused the death of Moses Red Bear," and "that you did that with a dangerous weapon . . . a .22 caliber handgun . . . without any design to affect the death[?]" Rangler also replied, "Yes, your honor." The court accepted his plea and found his waiver knowing, voluntary, and intelligent.

[¶51.] The record is devoid of any evidence suggesting either guilty plea was involuntary. Nothing in the written plea agreement addressed the Ceplechas' housing arrangements at the jail. Moreover, the fear of receiving a life sentence is not a "fair and just" reason for withdrawing a plea. When assessing voluntariness, we do not consider a defendant's after-the-fact regret about his decision to plead guilty. Rather, we review the defendant's competency to waive his constitutional rights and his appreciation of the consequences of pleading guilty at the time of the plea. *See State v. Jensen*, 2011 S.D. 32, ¶ 13, 800 N.W.2d 359, 365. As for Daniel's claim that DCI Agent Goble tampered with evidence or withheld his statements during his interview with police, the circuit court rejected this assertion as meritless and not supported by the record. Based on the circuit court's detailed colloquy with each defendant and their unequivocal answers to the court's advisement, we have no doubt that both Daniel's and Rangler's guilty pleas were knowing, voluntary, and intelligent.

### *Claims of Actual Innocence*

[¶52.]     Although Daniel and Rangler claimed actual innocence, they did not point to exculpatory evidence—namely, their allegation that Red Bear threatened them with a .45 caliber weapon prior to the shooting—until well after the court accepted their guilty pleas.  In fact, it was not until the hearing on the motion to withdraw their pleas, some twenty months after the killing, that they first presented this claim to the circuit court.  Yellow Hawk, who saw Red Bear just before he was fatally shot, never reported seeing Red Bear with a weapon.  The Ceplechas, rather than reporting the killing to law enforcement and explaining that they acted in self-defense, attempted to conceal their crime and disposed of Red Bear's body.

[¶53.]     Self-serving testimony in which a defendant proclaims his innocence is not a persuasive basis for allowing a defendant to withdraw his guilty plea.  *Bailey*, 1996 S.D. 45, ¶ 25, 546 N.W.2d at 393.  The circuit court weighed the Ceplechas' claims of self-defense and found them "simply not credible."  Further, the Ceplechas, in the presence of their attorneys, each admitted to the court that they caused the death of Moses Red Bear with a dangerous weapon.  Generally, lying to the court when entering a plea of guilty is not later to be considered a "fair and just reason for allowing a plea to be withdrawn." *Kvasnicka*, 2016 S.D. 2, ¶ 12, 873 N.W.2d at 710.

### *Prejudice*

[¶54.]     Although Rangler asserts that the State has failed to show how it would be prejudiced by allowing him to withdraw his plea, prejudice to the

prosecution, by itself, is not dispositive. *See Schmidt*, 2012 S.D. 77, ¶ 23, 825 N.W.2d at 896. Rangler must also "provide a persuasive reason why withdrawal should be permitted" and this he has failed to do. *Id.* ¶ 25, 825 N.W.2d at 896.

[¶55.] Based on our review of the totality of the circumstances, neither Daniel nor Rangler have established that the circuit court abused its discretion by denying their motions to withdraw their guilty pleas. To the contrary, in addition to the factors discussed above, Daniel and Rangler had the benefit of experienced and capable defense counsel who, throughout the course of the case, spent hundreds of hours preparing their defenses. As the circuit court found, absent evidence of a fair and just reason, allowing them to withdraw their pleas at this late stage of the proceedings would result in an unnecessary waste of judicial resources.

### 3.     Whether the circuit court erred in imposing life sentences.

[¶56.] Daniel and Rangler argue the circuit court violated the Eighth Amendment's prohibition against cruel and unusual punishment and abused its discretion when it sentenced them to the statutory maximum of life in prison for first-degree manslaughter.

### *Eighth Amendment*

[¶57.] Assessing "whether a noncapital sentence violates the Eighth Amendment requires us to determine de novo whether the sentence imposed is grossly disproportionate to its corresponding offense." *State v. Rice*, 2016 S.D. 18, ¶ 13, 877 N.W.2d 75, 80. We weigh "the gravity of the offense—i.e., the offense's relative position on the spectrum of all criminality—[against] the harshness of the penalty—i.e., the penalty's relative position on the spectrum of all permitted

punishments." *Id.* (citations omitted). With respect to the latter, we do not confine our comparison to the authorized punishment available for first-degree manslaughter. Instead, we consider the harshness of the defendant's sentences across all punishments authorized by our Legislature. *See id.* ¶ 15, 877 N.W.2d at 80–81.

[¶58.] If, following our review, we determine that the punishment appears to be "grossly disproportionate to the gravity of the offense, then we will compare the sentence to those 'imposed on other criminals in the same jurisdiction' as well as those 'imposed for commission of the same crime in other jurisdictions.'" *State v. Chipps*, 2016 S.D. 8, ¶ 38, 874 N.W.2d 475, 489 (quoting *Solem v. Helm*, 463 U.S. 277, 291, 103 S. Ct. 3001, 3010, 77 L. Ed. 2d 637 (1983)). "The challenged sentence is cruel and unusual only if these comparisons 'validate [the] initial judgment that [the] sentence is grossly disproportionate to [the] crime.'" *Rice*, 2016 S.D. 18, ¶ 13, 877 N.W.2d at 80 (quoting *Helm*, 463 U.S. at 291, 103 S. Ct. at 3010).

[¶59.] First-degree manslaughter is a grave offense when viewed on the spectrum of criminality. Even though it does not amount to murder, manslaughter nevertheless involves the unjustified killing of another human being. "[H]omicide has long been considered 'the highest crime against the law of nature, that man is capable of committing.'" *Rice*, 2016 S.D. 18, ¶ 14, 877 N.W.2d at 80 (quoting 4 William Blackstone, *Commentaries* *177–78). As the circuit court observed, "the consequences of taking a life are not simply grievous, they are incalculable[.]"

[¶60.] When Red Bear died, he was 33 years old and the father of several children. He had many friends and relatives. The enormity of his death and the

suffering his loved ones endure is reflected in the seventeen victim impact letters the court received prior to sentencing. The impact of Red Bear's killing and the subsequent desecration of his body was aptly described by his sister, Pearl Red Bear, at the sentencing hearing as "a nightmare that we will never be able to comprehend[.]"

[¶61.]        Despite the serious nature of the offense, the circuit court noted that neither Daniel nor Rangler appeared to grasp the gravity of their actions. Rather than take accountability for the harm they caused, the Ceplechas forced Yellow Hawk to clean up Red Bear's blood to conceal the evidence of their crime. Then, on their way out of town, Daniel and Rangler stopped at Fresh Start to put gas in their car and gas can, which they later used to burn Red Bear's body. They bought food and "chitchated" with the clerk while Red Bear's body lay in the back of their van. The callousness of their actions, the circuit court emphasized, "elevated [the situation] into an entirely other level of egregious conduct." Given the circumstances surrounding Red Bear's death, the gravity of first-degree manslaughter in this case is very high relative to all other types of crimes.

[¶62.]        We next review the harshness of Daniel's and Rangler's life sentences. First-degree manslaughter, a class C felony, carries a maximum sentence of life imprisonment and a fine of $50,000. *See* SDCL 22-6-1; SDCL 22-16-15. A life sentence, when reviewed against all other permitted punishments, is less than the harshest of all possible penalties—capital punishment (Class A felonies). It is also within the statutorily authorized sentencing scheme for first-degree manslaughter. SDCL 22-6-1.

[¶63.]	In light of the circumstances, Daniel's and Rangler's punishment for shooting Red Bear multiple times, dumping his body in a ditch, and lighting it on fire does "not appear to be grossly disproportionate." *See Rice*, 2016 S.D. 18, ¶ 15, 877 N.W.2d at 81. "If the threshold requirement of gross disproportionality is not met, the analysis under the Eighth Amendment ends." *State v. Traversie*, 2016 S.D. 19, ¶ 15, 877 N.W.2d 327, 332. Therefore, we need not address the Ceplechas' arguments that their sentences were harsh when compared to those imposed on other defendants within our jurisdiction. *Rice*, 2016 S.D. 18, ¶ 13, 877 N.W.2d at 80.

### *Abuse of discretion*

[¶64.]	Daniel and Rangler also assert the circuit court abused its discretion by sentencing them to life in prison. "In contrast to the Eighth Amendment analysis, the question whether the sentencing court acted within its discretion requires a separate analysis." *Id.* ¶ 23, 877 N.W.2d at 83. "To arrive at an appropriate sentence[,] the sentencing court should acquire a thorough acquaintance with the character and history of the man before it." *State v. Larsen-Smith*, 2011 S.D. 93, ¶ 8, 807 N.W.2d 817, 819. This requires studying "a defendant's general moral character, mentality, habits, social environment, tendencies, age, aversion or inclination to commit crime, life, family, occupation, and previous criminal record." *State v. Bonner*, 1998 S.D. 30, ¶ 19, 577 N.W.2d 575, 580. We review each sentence separately.

[¶65.]	Daniel argues that the circuit court failed to place sufficient weight on his lack of criminal history when it made its sentencing decision. Instead, in

Daniel's view, the court formulated its sentence based entirely on the events that transpired the evening Red Bear was killed. That decision, Daniel argues, overshadowed all other sentencing considerations.

[¶66.]     Yet lack of criminal history is just one factor in a list of considerations a sentencing court must review. *Larsen-Smith*, 2011 S.D. 93, ¶ 8, 807 N.W.2d at 819. Although the circuit court acknowledged Daniel's relatively clean record when determining his culpability, it concluded his lack of moral character, mentality, and social environment outweighed his limited criminal background. In fashioning an appropriate sentence, the court found that Daniel deemed himself to be at "war with society" and considered himself the victim in the case rather than Red Bear. Due to the cruelty of Daniel's actions and his lack of remorse, the court determined Daniel's crime merited a life sentence. The circuit court's decision, which was preceded by a proper weighing of the relevant factors, did not amount to an abuse of discretion.

[¶67.]     Rangler argues that the circuit court abused its discretion because his sentence was not sufficiently particularized from Daniel's sentence. In Rangler's view, the circuit court did not individually weigh the likelihood of his rehabilitation in light of his young age. Rangler, however, did not present any mitigation evidence based upon his age or other factors. And the circuit court did note Rangler's age in fashioning a sentence, stating, "I understand Rangler's young age of 24 years old . . . but in crafting a sentence that [has] a discretionary dimension . . . . I have considered that in relation to other things[.]" Based on our review of the record, it is apparent that the circuit court listed Rangler's potential for rehabilitation among

the relevant factors it considered when fashioning an appropriate sentence. Even if it had not, however, "prospects for rehabilitation need not be considered each time a defendant receives a life sentence." *Larsen-Smith,* 2011 S.D. 93, ¶ 16, 807 N.W.2d at 820.

[¶68.]     Although the court acknowledged that Rangler has developed some appreciation for the seriousness of the crime since his arrest, ultimately, it determined that Rangler's disregard for the law, his "cold blooded" and ruthless behavior, and lack of accountability posed a great risk to public safety. When considering his relative culpability, the circuit court emphasized that Rangler admitted to firing nine shots and "likely fired a shot to the head between the eyes." "[T]here are some acts of such a criminal magnitude that they justify a life sentence whether the perpetrator is capable of rehabilitation or not." *State v. Milk,* 2000 S.D. 28, ¶ 18, 607 N.W.2d 14, 20. The circuit court did not abuse its discretion in sentencing Rangler to a life sentence without parole.

## Conclusion

[¶69.]     The circuit court did not abuse its discretion in denying Rangler's motion for new counsel because he failed to establish a fair and just reason in support of his request. Further, the court did not abuse its discretion by denying Daniel's and Rangler's motions to withdraw their pleas of guilty to first-degree manslaughter. The court's imposition of life sentences did not constitute violations of the Eighth Amendment or abuses of discretion in either case. Based upon our careful review of the record and transcripts herein with respect to the individual

claims of Daniel and Rangler, we affirm both convictions and the sentences imposed.

[¶70.]    GILBERTSON, Chief Justice and JENSEN and SALTER, Justices, and HENDRICKSON, Circuit Court Judge, concur.

[¶71.]    HENDRICKSON, Circuit Court Judge, sitting for DEVANEY, Justice, disqualified.